**TIDELANDS ROYALTY "B" CORPORATION, Plaintiff,**

v.

**GULF OIL CORPORATION, Defendant.**

**No. CA 3–79–0244–R.**

United States District Court,
N.D. Texas,
Dallas Division.

June 18, 1985.

Kenneth S. Beat and Leo J. Hoffman, Strausberger & Price, Dallas, Tex., for plaintiff.

D.L. Case and A.W. Walker, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This oil and gas case involves a question of first impression.

It concerns production payments and overriding royalties in gas production from 4,062 acres of submerged land off the coast of Louisiana on the Outer Continental Shelf. These interests, which pertain to most of Block 332 of the West Cameron Area, were assigned to the plaintiff, Tidelands Royalty "B" Corporation ("Tidelands"), by the defendant, Gulf Oil Corporation ("Gulf"). Gulf's operations on adjoining property (Block 333) are, admittedly, draining gas from several of the producing sands under Block 332.

However, this is not a typical drainage controversy: the basic agreement between the parties *is not* an oil and gas lease; and, Gulf's promise to pay the overriding royalties and production payments was made 24 years before it even acquired a federal lease on Block 332. Nevertheless, despite the fact that the issue is a novel one, this opinion holds (i) that there is an implied covenant obligating Gulf to protect Tidelands' interests from drainage by *Gulf's own operations* on property adjacent to Block 332; but (ii) that, under the basic agreement, there is no implied covenant to protect Tidelands from drainage caused by offshore wells operated by third parties on adjoining lands.

### 1. FACTUAL BACKGROUND

In 1948 and 1949, Tidelands' predecessor—Pan American Exploration Company—conducted 16 geophysical reconnaissance surveys covering 2,700,000 acres of submerged lands off the coasts of southwest Louisiana and southeast Texas in the Gulf of Mexico. Later, Pan American was dissolved, and its assets—including the primary one, this geophysical data—were distributed to its shareholders.

On April 30, 1951, the Pan American shareholders sold this geophysical data to Gulf.[1] Under this agreement—which is the basic contract that controls in this case ("the 1951 Agreement")—Gulf (i) paid $2,000,000 in cash, and (ii) agreed to the future assignment of production payments and overriding royalty interests for a period of 50 years from April 30, 1951. These assignments were to be made whenever Gulf, during this 50-year period, acquired federal offshore oil and gas leases on certain designated portions of the 2,700,000 acres covered by the geophysical data.[2]

In 1954, Tidelands Royalty "B" Corporation ("Tidelands") was formed to receive and disburse the production payments and overriding royalties to be paid to the Pan American shareholders under the 1951 Agreement. All of the shareholders transferred their interests to Tidelands in exchange for stock in the corporation.[3]

Subsequently, Gulf acquired numerous offshore leases from the federal government covering areas subject to the 1951 Agreement. One occasion was September 1, 1955, when Gulf was the successful bidder at public auction for leases on Blocks 332 and 333 in the West Cameron Area off the coast of Louisiana. Both of these blocks contained 5000 acres; Block 333 was not one of the "designated tracts" in the 1951 Agreement, but 4,062 acres in Block 332 had been specified as a tract subject to the production payments and overriding royalties due to Tidelands.

Accordingly, on October 30, 1975, Gulf executed an "Assignment of Overriding Royalty" to Tidelands covering the 4,062 acres in Block 332.[4] This assignment transferred to Tidelands, free and clear of all costs of development and operation, "a production payment and overriding royalty, to be calculated and determined in accordance with Paragraph II(b)" of the 1951 Agreement. It also provided:

"This instrument has been executed and delivered pursuant to the terms of that certain Agreement dated April 30, 1951, made and entered into by and between W.L. Moody, III, et al and Gulf Oil Corporation and Gulf Refining Company, and *this instrument is subject to all of the terms, conditions, provisions and limitations thereof.*" (emphasis added.)

Later, Gulf began drilling operations under the two federal offshore leases it had obtained on September 1, 1955. The first well was drilled on Block 332; it was a dry hole. The second well was drilled on Block

1. The sellers under the 1951 Agreement—which is exhibit 1 to the original complaint—were W.L. Moody, III, Marine Instrument Company, and Mexican Gulf Sulphur Company, three of the Pan American shareholders; Wright Morrow and Ethan Stroud, the trustees for the remaining Pan American shareholders; and R.A. Irwin, a broker who received an interest in the geophysical data in return for his efforts in finding a buyer. The purchasers were Gulf Oil Company and Gulf Refining Company.

2. In the 1951 Agreement, 60 tracts (or "units") of varying sizes were designated as the areas that would be subject to these production payments and overriding royalties:

   (i) a production payment equal to the market value at the well of $1/8$th of the oil, gas and minerals produced, saved and sold from the first 5,000 "productive acres" until the sum of $1,500,000 had been paid from the proceeds of production from *each* designated unit; thereafter, a $1/24$th overriding royalty from *each* unit.

   (ii) an additional $1/8$th production payment from certain "excess productive acreage" as defined in the agreement, up to an amount determined by a formula set forth in the agreement; thereafter, a $1/24$th overriding royalty on this "excess productive acreage;"

   (iii) an overriding royalty of $1/24$th of the value of all minerals other than oil and gas found on the designated units.

One of the designated areas covered 4,062.50 acres of the total 5,000 acres in Block 332 of the West Cameron Area.

3. With the exception of three minor Pan American shareholders: Mrs. Dora Lee Koenig Cobb, George M. Russell, and Mrs. Catherine S. Russell. Accordingly, Tidelands became the owner of a 1,386,375/1,386,525th interest in the production payments and overriding royalties which Gulf was obligated to pay under the 1951 Agreement.

4. This assignment—which is exhibit 2 to the original complaint—became effective September 1, 1955. It recited that Tidelands was the "successor in interest" to the Pan American shareholders under the 1951 Agreement.

333; it was successful, producing gas in commercial quantities, and was the "discovery well" for the field. An offshore drilling platform was then constructed on Block 333, from which wells could be directionally drilled. The third well was drilled on Block 332 and the fourth well on Block 333. The fifth well was drilled on Block 332 and the sixth and seventh wells were drilled on Blocks 333.

However, there are at least five producing sands underlying the Block 332–333 gas field. And, *it is undisputed that the wells on Block 333 are draining gas from Block 332 in several of these productive sands.* For example, two of Gulf's wells on Block 333 are producing gas from the "C–13" sand, but neither of the wells on Block 332 produces from this sand. There is also drainage of gas from Block 332 in the "C–5" and "C–7" sands.[5]

Accordingly, Tidelands claims that this drainage of gas from Block 332—by Gulf's operations on the adjoining land—is damaging or destroying its production payments and overriding royalties under the 1951 Agreement. It argues that, under this agreement, there is an implied covenant obligating Gulf to prevent this drainage—either by drilling protection wells in these sands on Block 332, or by pooling the two blocks, or by the payment of "compensatory royalties."[6] In return, Gulf argues that the 1951 Agreement is "merely" a sales contract, not an oil and gas lease; that it specifically provides that Gulf "shall never be under any duty to drill for or produce" gas from Block 332; that, therefore, there is no implied covenant to protect Tidelands

against drainage of Block 332; and that any contrary decision "would amount simply to a conveyance by Gulf to [Tidelands] of an overriding royalty interest and production payment in Block 333."

■ Tidelands has moved for a partial summary judgment on the question of whether or not there is an implied covenant obligating Gulf to protect against the drainage of Block 332. As to this issue, there are no genuine issues of any material fact[7]—and, as a matter of law, there is an implied covenant under the 1951 Agreement which requires Gulf to protect Tidelands' interests from drainage *by Gulf's own operations.* This conclusion requires analysis of (i) the question of jurisdiction, (ii) the choice of law issue, and (iii) the law of both Louisiana and Texas concerning implied covenants to protect against drainage.

## 2. JURISDICTION

This Court has jurisdiction under the Outer Continental Shelf Lands Act ("the Lands Act"), 43 U.S.C. § 1331 et seq. Specifically, § 1349(b)(1) provides that:

"... the district courts of the United States shall have jurisdiction of cases and controversies arising out of or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development or production of the minerals, of the subsoil and seabed of the outer Continental

---

5. Gulf's original answer admits that its gas wells on Block 333 are draining gas from Block 332 in several of the gas reservoirs that underlie both blocks. The *fact* of this drainage is also established by the Affidavit of Phil Porter, filed in support of Tidelands' motion for partial summary judgment. However, Gulf correctly argues that the "*extent* of any net uncompensated drainage across the common boundary line between the two leases, and what if anything that Gulf could or should have done to prevent drainage of gas from the lower parts of a structure to the higher portions" will present complex and controverted issues of fact that can only be resolved by a trial.

6. The 1951 Agreement expressly provides that Gulf "is hereby authorized and empowered by [Tidelands' predecessors] to at any time or from time to time 'pool' the area subject to this Agreement or any part or parts thereof with any adjoining and adjacent area."

7. The summary judgment record consists of the pleadings and the several affidavits filed by Tidelands and by Gulf in connection with the partial motion for summary judgment.

Shelf, or which involves rights to such minerals ..." [8]

Here, Tidelands claims that Gulf's operations on Block 333 are draining gas from Block 332. Both blocks are located on the outer Continental Shelf. Therefore, this controversy arises "out of or in connection with" Gulf's "development or production" operations conducted on the outer Continental Shelf, and there is jurisdiction under § 1349(b)(1). *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223 (5th Cir.1985) (federal district court had jurisdiction under "the Lands Act" over dispute involving construction of offshore drilling platform on the Outer Continental Shelf); *Fluor Ocean Services, Inc. v. Rucker Co.*, 341 F.Supp. 757 (D.C.La.1972) (federal district court had jurisdiction over controversies which are only indirectly connected with the "development or production" operations conducted on the outer Continental Shelf).

■ Accordingly, since jurisdiction exists under the Lands Act, this Court must proceed under the provisions of that Act; it does not sit as a diversity court, even though diversity jurisdiction also exists.[9] *Aymond v. Texaco, Inc.*, 554 F.2d 206 (5th Cir.1977); *Chevron Oil Co. v. Huson*, 404 U.S. 97, 103 n. 5, 92 S.Ct. 349, 353 n. 5, 30 L.Ed.2d 296 (1971); *Ellis v. Chevron U.S.A., Inc.*, 650 F.2d 94, 96 (5th Cir.1981).

However, Tidelands contends that § 1333(a)(2)(A) has not been implemented because the President has never designated the projected boundary lines contemplated by this section [10]—and that, since

§ 1333(a)(2)(A) does not apply, this Court must apply the conflicts rules of Texas, the forum state, in determining what law is applicable. In this manner, Tidelands reasons that Texas law controls.

■ This argument is rejected. Tidelands has not cited a single case in support of its theory that the Presidential designation of projected boundaries is an absolute, statutory prerequisite to the operation of § 1333(a)(2)(A). Although there appears to be no case which *directly* addressed this issue, the Tidelands argument is refuted by numerous cases in which the courts have applied this section and have followed the laws of the "adjacent state" in suits brought under the Lands Act.[11] For example, in *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), the Supreme Court stated:

"The [Lands Act] ... mandates that state laws apply as federal laws '[t]o the extent that they are applicable and not inconsistent with this subchapter or with other federal laws.' 43 U.S.C. § 1333(A)(2). In any particular case, the adjacent State's law applies to those areas 'which would be within the area of the State if its boundaries were extended seaward to the outer margin of the Outer Continental Shelf ...' *Ibid.* *The statute thus contains an explicit choice of law provision....*" (453 U.S. at 485–86, 101 S.Ct. at 2878–2879.) (emphasis added).

---

**8.** The original complaint refers to § 1333(b) of the Lands Act, the jurisdictional provisions enacted in 1953. However, those provisions were deleted in the 1978 amendments to the Act, and re-enacted in amended form as § 1349(b)(1).

**9.** Tidelands is a Delaware corporation; Gulf is a Pennsylvania corporation. The complaint alleges, and the answer admits, the fact of diversity jurisdiction—as well as jurisdiction under the Lands Act.

**10.** Tidelands makes this argument even though it is undisputed that the areas in question in this case, Blocks 332 and 333 of the West Cameron Area, are off the coast of Louisiana—and, therefore, would lie within any boundary lines

projected outward from Louisiana, as contemplated by § 1333(a)(2)(A).

**11.** *See*, e.g., *Walker v. Tenneco Oil Co.*, 615 F.2d 1121 (5th Cir.1980); *Mott v. ODECO*, 577 F.2d 273 (5th Cir.1978), cert. denied, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461; *Moczygemba v. Danos & Curole Marine Contractors, Inc.*, 561 F.2d 1149 (5th Cir.1977); *Aymond v. Texaco, Inc.*, 554 F.2d 206 (5th Cir.1977); *Louviere v. Shell Oil Co.*, 509 F.2d 278 (5th Cir.1975), cert. denied, 423 U.S. 1078, 96 S.Ct. 867, 47 L.Ed.2d 90; *Bertrand v. Shell Oil Co.*, 489 F.2d 293 (5th Cir. 1973); *Dickerson v. Continental Oil Co.*, 449 F.2d 1209 (5th Cir.1971), cert. denied, 405 U.S. 734, 92 S.Ct. 942, 30 L.Ed.2d 809 (1971).

See also *Chevron Oil Co. v. Huson*, 404 U.S. at 102–103, 92 S.Ct. at 353; *Rodrique v. Aetna Casualty Co.*, 395 U.S. 352, 89 S.Ct. 1835 (1969).

### 3. CHOICE OF LAW

The matters involved in this case—Tidelands' production payments and overriding royalties, Gulf's operations on Blocks 332 and 333 of the West Cameron area—involve submerged lands lying off the coast of Louisiana. Therefore, it seems clear that § 1333(a)(2)(A) of the Lands Act requires the application of Louisiana law to this dispute. That provision states:

"... the civil and criminal laws of each adjacent State ... are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf ... which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area...."

■ Moreover, even if § 1333(a)(2)(A) were not operative, it is obvious that Louisiana law should be applied in this case. Texas, the forum state, has adopted the approach of the Restatement (Second) of Conflict of Laws in deciding choice of law questions. *Duncan v. Cessna Aircraft Company*, 665 S.W.2d 414 (Tex.1984); *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex. 1979). Louisiana, the state where the offshore lands and drilling operations are located, has also adopted this approach. *Lee v. Hunt*, 631 F.2d 1171, 1174 (5th Cir.1980);

*Wickham v. Prudential Insurance Co. of America*, 366 So.2d 951 (La.App.1978). Therefore, under the conflict of law rules of either Texas or Louisiana,[12] the state law having the most significant relationship to the single issue addressed in this opinion should control.

Here, the issue involved is the existence of an implied covenant to protect against drainage. Texas has some interest in this issue since all of the parties executed the 1951 Agreement in Texas and since payments were to be made to Tidelands in this state. However, Louisiana also has obvious and more compelling interests in this issue: the assignment of the production payment and overriding royalties was executed in that state; the submerged lands in question are off the coast of Louisiana; and the drilling operations by Gulf—which are alleged to have breached the implied covenant—are being conducted on these lands.

In addition, this issue involves leases on federal lands located on the outer Continental Shelf. The Lands Act creates a comprehensive scheme for regulation of the relationship between the federal government, as lessor, and its lessees. 43 U.S.C. § 1334–56. Yet, it recognizes the substantial interests of the local states in their offshore lands, by providing that the laws of the state adjacent to the submerged lands should control. 43 U.S.C. § 1332(a)(2). This certainly supports the conclusion that the state of Louisiana has a more significant relationship to the matters in this case—involving interests in production from submerged lands off its coast, and the claimed violation of an implied cov-

**12.** Tidelands contends that—even if § 1333(a)(2)(A) is operative, so as to require the application of Louisiana law—then *the* Louisiana law to be applied *must* include the state's choice of law rules. This is a doubtful proposition. See *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. at 482, n. 8, 101 S.Ct. at 2877, n. 8 (the Lands Act "does supercede the normal choice-of-law rules that the forum would apply"); *Chevron Oil Co. v. Huson*, 404 U.S. at 102–03, 92 S.Ct. at 353 ("ordinary conflict of law principles have no relevance" when state law is applied as federal law under the Lands Act.)

Section 1333(a)(2)(A) specifically adopts the substantive law of the state adjacent to the sub-

merged land as surrogate law *to be enforced as federal law*. Therefore, application of the adjacent state's choice of law rules would be "inapplicable" or "inconsistent" with this explicit adoption, and of § 1333(a)(2)(A), if they directed that the substantive law of a different state should be applied. However, this issue has not been addressed in a case brought under the Lands Act. Cf. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961). And, since the conflict rules of Texas and Louisiana are the same, it is of academic interest only in this case.

enant to prevent the drainage of those lands—than does Texas, whose interests merely involve the execution of a contract.

Accordingly, Louisiana law controls the issue of the implied covenant to protect against drainage (although, as discussed below, the same result would be reached under the law of Texas).

## 4. IMPLIED COVENANTS—GENERALLY

█ Courts have long recognized that oil and gas leases give rise to implied covenants which govern the conduct of the lessee. These implied covenants—which are for the benefit of the lessor and for the protection and preservation of the value of his reserved royalties—include the duty to reasonably develop, the duty to use reasonable diligence in producing and marketing the oil and gas, and the duty to protect against drainage from operations on adjoining property.[13]

However, the courts differ with respect to the standard to be applied to determine whether or not the lessee has breached an implied covenant. Some courts have held that the lessee's actions should conform to what a reasonably prudent oil and gas operator would do under the same circumstances; other courts hold that the lessee's own good faith judgment is controlling. 2 Summers, OIL AND GAS § 416 at 641 (Perm.Ed.1959). The first standard—that of the reasonably prudent operator—is now applied in most states. *Id.*, at 647; Williams and Meyers, OIL AND GAS LAW § 806.3[14]

█ An implied covenant to protect against drainage may be implied even though the lease in question contains a provision which expressly relieves the lessee "of the obligation to drill any well or develop any lease." Courts have reasoned that the covenant to drill offset wells to protect the property from drainage caused by operations on adjacent land is "separate and distinct" from the covenant to reasonably develop the property, whether these covenants "are express or implied." *Foster v. Atlantic Refining Co.*, 329 F.2d 485 (5th Cir.1964); *Brown v. Smith*, 141 Tex. 425, 174 S.W.2d 43 (1943). They have also recognized that the implied covenant to protect against drainage is essential if the provision for royalties is to be given effect: the agreed royalty can be realized only if there is production from the leased premises, and oil and gas that are drained away as the result of operations on adjacent lands can never be recovered. See Williams and Meyers, OIL AND GAS LAW § 815.

Indeed, *this is particularly so where the drainage is being caused by the lessee's own operations on adjacent land.* That is, if the drainage results from operations by a third party, then the interests of the

---

**13.** Hemingway, THE LAW OF OIL AND GAS § 8.1 (1971) summarizes the major implied covenants in this manner:
"(A) Implied covenants to develop the leases.
  (1) To drill an initial well.
  (2) To reasonably develop the lease after production has been acquired.
(B) Implied covenants of protection.
  (1) To protect against drainage.
  (2) Not to depreciate the lessor's interest.
(C) Implied covenants relating to management and administration of the lease.
  (1) To produce and market.
  (2) To operate with reasonable care.
  (3) To use successful modern methods of production and development.
  (4) To seek favorable administration action."
See also the lists in Brown, THE LAW OF OIL AND GAS LEASES § 16.02 at 16–6 (2nd Ed. 1973); Merrill, COVENANTS IMPLIED IN OIL AND GAS LEASES, at 23 (2nd Ed.) 2 Summers, OIL AND GAS § 395 at 535 (Perm Ed.1959);

and Williams and Meyers, OIL AND GAS LAW § 802.

**14.** There does appear to be considerable disagreement as to the theoretical basis for implied covenants. One view holds that such covenants are *implied in fact*, and must therefore be derived from the written agreement and the circumstances surrounding its execution; the other maintains that they are *implied in law*, and are added to the contract by the court to promote fairness, justice, and equity. Williams and Meyers, OIL AND GAS LAW § 803. In the present case, since there is no genuine issue of any material fact concerning the existence of an implied covenant to protect against drainage—and since the 1951 Agreement is clear and unambiguous—this dispute is merely of academic interest. See Walker, "The Nature of the Property Interests Created by an Oil and Gas Lease in Texas," 11 Texas L.Rev. 402, 404–05 (1933).

lessor and the lessee coincide—and the lessor can reasonably expect the lessee to drill offsetting wells to protect his own economic interest in the property. However, when it is the lessee himself who is causing the drainage by operations on adjacent land, the economic interests of the lessor and the lessee no longer coincide—since the lessor recovers the oil and gas drained from the leased premises without the expenses of drilling and operating a protection well, and without paying royalties to the lessor. For these reasons, courts have recognized the strong need for protection in cases arising out of lessee-caused drainage. Thus, in *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187 (Tex.1966) (per curiam), the Texas Supreme Court stated:

> "... the Court of Civil Appeals correctly held that the express provision in the Stansbury lease which obligated Shell to drill an offset well if a draining well was within a specified distance from the Stansbury property line did not limit Shell's obligation to drill when Shell was the one causing the drainage to the Stansbury land.... [A] lessee is under a duty to protect his lessor against depletion of the lessor's minerals by the affirmative act of the lessee upon adjacent land." (410 S.W.2d at 188.)

See also *Humphreys Oil Co. v. Tatum*, 26 F.2d 882 (5th Cir.1928); *Phillips Petroleum Co. v. Millette*, 72 So.2d 176 (Miss. 1954); *Trimble v. Hope Natural Gas Co.*, 117 W.Va. 650, 169 S.W. 529 (W.Va.1933); *Hughes v. Busseyville Oil & Gas Co.*, 180 Ky. 545, 203 S.W. 515 (Ky.1918).

Although implied covenants normally arise in the context of an oil and gas lease—and although they usually protect the lessor's reserved royalty interests—they are certainly not peculiar to the lessor-lessee relationship. Implied covenants have been found to exist in other types of contracts, such as mineral deeds or assignments of leases. *Phillips Petroleum Co. v. Taylor*, 116 F.2d 994, 995 (5th Cir.1941) ("the same rules govern [with respect to lease assignments] as are applied to covenants in the contract between the lessor and lessee"); *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 6 S.W.2d 1039 (Tex.1928) (mineral deed).

■ And, the holder of an overriding royalty interest [15] is generally entitled to the same implied covenants that apply to protect royalty interests under leases.[16] *Jackson v. Texas Co.*, 75 F.2d 549 (10th Cir.1935); *Bolton v. Coats*, 533 S.W.2d 914 (Tex.1975). Obviously, an assigned overriding royalty interest—just like a royalty reserved under a lease—can be realized only if an implied covenant against drainage prevents the permanent loss of oil and gas from the property.[17] Once again, the need for an implied covenant to protect an overriding royalty interest is particularly strong where it is the lessee himself who is causing the drainage by operations on adjacent property. *Cook v. El Paso Natural Gas Co.*, 560 F.2d 978 (10th Cir.1977).

## 5. THE IMPLIED COVENANT AGAINST DRAINAGE

### a. Louisiana Law

Louisiana recognizes the existence of an implied covenant obligating a lessee to pro-

---

**15.** For convenience, references in this discussion to "overriding royalty interests" also include "production payments," like those created in the 1951 Agreement involved in this case. A production payment, or oil payment, is also a nonparticipating interest in oil and gas produced at the surface, free of expense of production. It differs from an overriding royalty only in that it is fixed in amount and expires when the specified amount has been paid. 2 William & Meyers, OIL AND GAS LAW § 422–422.3a; Walker, "Oil Payments," 20 Tex.L.Rev. 259, at 269 (1942).

**16.** See the cases cited in 3 Summers, OIL AND GAS § 554; 2 Williams and Meyers, OIL AND GAS LAW § 421. Almost all of these cases involved overriding royalties reserved by a party assigning an oil and gas lease—rather than an overriding royalty obtained by grant from the lessee, as in this case—but there is no basis for a legal distinction between overriding royalties created by grant, and those created by reservation. *Id.*, at § 418; Merrill, COVENANTS IMPLIED IN OIL AND GAS LEASES § 191.

**17.** But see *McNeill v. Peaker*, 488 S.W.2d 706 (Ark.1973); *Kile v. Amerada Petroleum Corp.*, 247 P. 681 (Okla.1925).

tect leased premises from drainage; and, like most states, it has adopted the prudent operator test as the standard to determine whether this covenant has been breached. *Coyle v. North American Oil Consol.*, 9 So.2d 473 (La.1942); *Breaux v. Pan American Petroleum Corp.*, 163 So.2d 406 (La. App.1964), cert. denied, 246 La. 581, 165 So.2d 481 (La.1964). Indeed, article 122 of the Louisiana Mineral Code [18] provides that the lessee is bound to "operate the leased premises as a reasonably prudent operator for the mutual benefit of himself and his lessor"; and the official comment to article 122 states that the lessee has "the obligation to protect the leased property against drainage by wells located on neighboring property."

■ Moreover, under Louisiana law, the presence of a lease provision negating any obligation by the lessee to develop the premises does not preclude the implication of a covenant to protect against drainage. In *Williams v. Humble Oil & Refining Co.*, 432 F.2d 165 (5th Cir.1970), cert. denied, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971), the Fifth Circuit, *applying Louisiana law*, held that an express lease provision concerning the lessee's obligation to drill offset wells did not displace the implied covenant to protect against drainage. The court stated:

"The duty of a Louisiana lessee to use the leased premises as a good administrator must of course encompass an obligation to protect the premises against any impairment of value threatened by

the affirmative act of the lessee himself. Any obligation as basic as this one to the protection of the lessor can not be displaced by the insertion in the lease of an express provision relating solely to the establishment of offset wells." (432 F.2d at 177.)

And, Louisiana also recognizes that the need for an implied covenant against drainage is particularly strong where the drainage is being caused by the lessee's own operations on adjacent property. In *Williams v. Humble Oil & Refining Co.*, 432 F.2d 165, the Fifth Circuit so held, after noting that:

"At the outset it must be recognized that there are no decisions of the Louisiana courts squarely in point. A review of the decisions of other jurisdictions reveals an increasing reluctance to allow displacement of the implied protection covenant by express offset provisions, especially when the lessee is also the operator whose drilling on adjacent land is causing the drainage." (432 F.2d at 175.)

*Williams* also stated that the "experience of the Texas courts is illustrative," and relied upon *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187 (quoted above) [19] and other Texas cases in its determination of the Louisiana law.

However, there appears to be no Louisiana case in which a covenant to protect against drainage was implied to protect an overriding royalty interest.[20] By its terms,

---

18. The Louisiana Mineral Code is found at LSA–R.S. 31:1 et seq.

19. The comment to Article 122 of the Louisiana Mineral Code—which addresses unitization as an alternative remedy to the drilling of protection wells if the implied covenant against drainage is breached by lessee-caused drainage—also supports this holding in *Williams*. (432 F.2d at 174.) See also *Pan American Petroleum Corp. v. Udall*, 192 F.Supp. 626 (D.D.C.1961); *R.R. Bush Oil Co. v. Beverly-Lincoln Land Co.*, 158 P.2d 754 (Cal.App.1945).

20. In *Iberian Oil Corp. v. Phillips Petroleum Co.*, 226 F.Supp. 190 (W.D.La.1964), the federal district court held that a sublessee was not obligated to protect the overriding royalty interest (retained by the sublessor upon assignment of the

lease) from drainage while an action brought by the sublessor/overriding royalty owner was pending; however, the issue of whether a protection covenant would be implied in the absence of the pending suit was not considered. Also inapplicable is *Uzee v. Bollinger*, 178 So.2d 508 (La.App.1965), which involved a royalty interest retained by the landowner upon the conveyance of mineral rights to the land; there, the court held that there was neither a principal-agent nor a fiduciary relationship between the vendor and purchaser which would require the purchaser to account to the vendor for production payments and overriding royalties granted to him in a collateral agreement and compromise with the mineral lessee.

Article 122 of the Louisiana Mineral Code applies only to oil and gas leases; and—although the owners of overriding royalties are afforded protection in other contexts, see articles 108 and 109—the Code contains no provisions regarding the duties owed by a lessee to the owner of an overriding royalty interest.[21] However, it does provide that "the Civil Code or other laws are applicable" in matters not expressly or impliedly provided for in the Mineral Code. La.Min.Code art. 2. And, under LSA–C.C. art. 2026, conditions may be implied in a contract as the result of the operation of law, the nature of the contract, or the presumed intent of the parties. See also LSA–C.C. arts. 1903, 1964.

Obviously, these general principles apply to oil and gas contracts other than leases—and would permit the implication of covenants for the protection of overriding royalty interests under Louisiana law. Indeed, in *Wier v. Grubb*, 215 La. 967, 41 So.2d 846 (La.1949), 228 La. 254, 82 So.2d 1 (La.1955), the Louisiana Supreme Court recognized, *albeit in dicta*, that an overriding royalty reserved by the assignor of a lease (a "sublease," under Louisiana law) is entitled to the protection of the same implied covenants involved in the lessor-lessee relationship. The court stated:

"Obviously, the determination of the question whether defendants have sufficiently developed the leased property, in compliance with the development clause contained in the sublease *and its implied obligations*, can be resolved only after a consideration of all the facts. We recognize the difficulty of laying down any comprehensive rule which so largely involves one of fact, and, therefore, the merits of each case must be determined according to its particular circumstances." (82 So.2d at 7) (emphasis added).

Moreover, just as the Fifth Circuit did in *Williams* (432 F.2d at 175), this Court finds that the "experience of the Texas courts is illustrative." Texas does recognize that overriding royalty interests are entitled to the protection of the implied covenant against drainage—particularly where the lessee's own operations on adjoining property are causing the drainage. *Phillips Petroleum Co. v. Taylor*, 116 F.2d 994 (5th Cir.1941); see *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187. This supports the conclusion that Louisiana law would afford protection to an overriding royalty interest by an implied covenant to protect against drainage. See *Williams v. Humble Oil & Refining Co.*, 432 F.2d 165, 175.

**b. Texas Law**

The Texas law regarding implied covenants to protect against drainage is more developed than that of Louisiana.[22] The Texas cases make it clear:

(i) That there is an implied covenant obligating the lessor to protect the leased property from drainage, and that the "prudent operator" standard applies to determine if this covenant has been breached. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex.1981); *Texas Pacific Coal & Oil Co. v. Barker*, 6 S.W.2d 1031 (Tex.1928); *J.M. Guffey Petroleum Co. v. Jeff Chaison Townsite Co.*, 48 Tex.Civ.App. 555, 107 S.W. 609 (Tex.Civ.App.1907).

(ii) That this implied covenant to protect against drainage may exist even if the lease provides that the lessee is not obligated to develop the property. *Foster v. Atlantic Refining Co.*, 329 F.2d 485 (5th Cir.1964); *Stanolind Oil & Gas Co. v. Christian*, 83 S.W.2d 408 (Tex.Civ. App.—Texark.1935, writ ref'd).

---

**21.** If, as in this case, the overriding royalty interest is created by one other than a landowner who owns mineral rights or by the owner of a mineral servitude, it is not included in the term "royalty interest" as defined by the Louisiana Mineral Code. La.Min.Code arts. 80–82. Cf. *Whitehall Oil Co. v. Eckart*, 197 So.2d 664, 668–89 (La.Civ.App. 3rd Cir.1967) (a pre-Code case).

**22.** Presumably, this is the reason for the dispute in this case concerning the choice of law. Tidelands contends that Texas law controls; Gulf argues that Louisiana law should be applied. However, as discussed above, the result in this case would be the same under either state's law.

(iii) That the need of this implied covenant is particularly strong where the drainage is being caused by the lessee's own operations on adjoining land. *Shell Oil Co. v. Stansbury,* 410 S.W.2d 187; *Houston National Bank v. Farris,* 549 S.W.2d 420 (Tex.Civ.App.—Waco 1977, writ dism'd); *Humphreys Oil Co. v. Tatum,* 26 F.2d 882 (5th Cir.1928).

(iv) That overriding royalty interests are entitled to the same protections by implied covenants, including the protection against drainage, that apply to the protection of royalty interests under leases. *Bolton v. Coats,* 533 S.W.2d 914 (Tex.1975); *Phillips Petroleum Co. v. Taylor,* 116 F.2d 994 (5th Cir.1941).

### c. The Applicable Standard

Under both Louisiana and Texas law, the Tidelands interests in this case—overriding royalty interests and production payments created by an agreement other than an oil and gas lease—*may* be subject to the protection of an implied covenant for protection against drainage. However, this Court cannot rewrite contracts, or create a new one, for the benefit of a party. Instead, as stated in *Danciger Oil & Refining Co. v. Powell,* 154 S.W.2d 632 (Tex. 1941):

> "An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument." (154 S.W.2d at 635.)

See also *Freeport Sulphur Co. v. American Sulphur Royalty Co.,* 117 Tex. 439, 6 S.W.2d 1039, 1041 (Tex.1928).

This is the proper standard under Louisiana law: *Coyle v. North American Oil Consol.,* 9 So.2d 473, 478–79 (La.1942) ("legal effect must be given to the contract according to the intent of the parties, and the intent is to be determined by the words of the contract, when these are clear and lead to no absurd consequenced"); *Breaux v. Pan American Petroleum Corp.,* 163 So.2d 406; *United Lands Co. v. Pan-American Production Co.,* 13 So.2d 519, 521 (La.App.1943) (contracts involving leases must be construed "most strongly against the lessee and in favor of the lessor").

The principle of strict construction also applies in Texas. Indeed, in *Bolton v. Coats,* 533 S.W.2d 914, the Texas Supreme Court held that *"unless the assignment provides to the contrary,* the assignee of an oil and gas lease impliedly covenants to protect the premises against drainage when the assignor reserves an overriding royalty." *Id.* at 916. That holding was followed in *Wes-Tex Land Co. v. Simmons,* 566 S.W.2d 719 (Tex.Civ.App.—Eastland 1979), and in *U.S. Steel Corp. v. Whitley,* 636 S.W.2d 465, 473 (Tex.Civ.App.—Corpus Christi 1982, writ ref'd n.r.e.).

### 6. THE IMPLIED COVENANT IN THIS CASE

This case is unlike the typical drainage controversy. Gulf's promise to pay overriding royalties and production payments was made prior to the acquisition of oil and gas leases and without reference to any particular lease. However, the 1951 Agreement clearly contemplates the use of the geophysical data in a search for oil and gas in submerged lands off the coasts of Texas and Louisiana.[23] Furthermore, the leases *were* in existence when the successive assignments of the overriding royalties and production payments were granted by Gulf to Tidelands in accordance with the

---

**23.** Under this agreement, Gulf received not only "absolute title" to the geophysical data, but also the right to its continuing, *exclusive* use—plus covenants precluding Tidelands from acquiring leases or conducting any geophysical work in this area (with any violations resulting in cancellation of the overriding royalties and production payments).

terms of the Agreement.[24] Therefore, in a very real and practical sense, the 1951 Agreement has much in common with an oil and gas lease—especially since both parties relied upon the finding and production of oil and gas in order to gain their ultimate profits from the transaction.

Therefore, the same factors which underlie the implied covenant against drainage in an oil and gas lease support the implication of this same protection under the 1951 Agreement between Tidelands and Gulf. In particular:

(i) the overriding royalties and production payments were a material part of the consideration for the 1951 Agreement, just as royalties are a material part of the consideration under a lease;

(ii) the condition upon which the payment of these royalties and production payments depended—production of oil and gas from the subject property—was within the exclusive control of Gulf, just as in the case of a lease;

(iii) the implication of a covenant to protect against drainage being caused by the operations of Gulf on adjacent property is necessary to prevent the frustration of the 1951 Agreement, and the proper payment of the overriding royalties and production payments.

### a. The Consideration

It is evident, from the face of the 1951 Agreement, that a material portion of the consideration to be received by Tidelands, for the sale of the geophysical data, was the overriding royalties and production payments which were to be paid out of production from leases acquired by Gulf during a period of 50 years. In fact, more than half of the Agreement is devoted to the overriding royalty and production payment interests [25]—and the *potential* income to Tidelands from these interests was far greater than the $2,000,000 paid in cash by Gulf.[26]

Obviously, Gulf's obligation to pay these overriding royalties and production payments to Tidelands is totally dependent upon the production of oil and gas by Gulf from the areas designated in the Agreement. And, if Gulf is (as alleged) engaging in operations on adjacent property which result in the drainage of oil and gas from Block 332, then Gulf is reducing or destroying the value of Tidelands' overriding royalties and production payments. Contrary to Gulf's argument that the 1951 Agreement is merely "a simple sales contract"— and its erroneous contention that Tidelands "has already received the only consideration that Gulf [was] obligated to pay"— there is nothing in the 1951 Agreement that would even suggest that such conduct by Gulf should be subject to different rules from those which are applied to parties to oil and gas leases and other contracts. See *Breaux v. Pan American Petroleum Corp.*, 163 So.2d 406; *Phillips Petroleum Co. v. Taylor*, 116 F.2d 994; *Jackson v. Texas Co.*, 75 F.2d 549.

### b. The Non-Development Clauses

Paragraph II(b)(2) of the 1951 Agreement, which provides for the calculation of the oil payments and royalties based upon "productive acres," also contains this language:

"... The procedure herein set forth for determining the number of 'productive acres' is not intended to impose any

24. Each of these assignments—including the October 30, 1975 Assignment of Overriding Royalty involved in this case—was expressly subject to "all of the terms, conditions, provisions and limitations" of the 1951 Agreement.

25. Section II(b) of the Agreement, which sets forth Gulf's obligation to pay production payments and overriding royalties to Tidelands, and which explains the method to be used to calculate the amount of these payments, covers nearly seven full pages.

26. In addition to the cash payment of $2 million, Gulf agreed to the future assignment of production payments of $1,500,000 from *each* of 60 designated "units," *plus* additional production payments from "excess productive acreage" within each "unit," *plus* overriding royalties from each "unit" when the production payments were satisfied (See footnote 2.) The *potential* income from the production payments alone was $90,000,000.

duty on [Gulf] to drill for oil or gas, or other minerals, according to any particular spacing pattern or density, it being the intention of the parties hereto that *[Gulf] shall never at any time be under any duty to drill for or produce oil, gas or other minerals from any area subject to this agreement,* notwithstanding the existence of producing wells thereon." (emphasis added.)

Similarly, Paragraph IV of the 1951 Agreement provides:

"Nothing in this agreement shall ever obligate [Gulf] to acquire any lease or leases or to drill any well or to develop any lease or leases if acquired. The oil payment and overriding royalty provisions set out herein shall apply to oil, gas and other minerals only when, as and if produced, saved and sold by Purchaser or its assigns."

The effect of these provisions was to condition Tidelands' right to receive payments upon Gulf's decision to produce on Block 332, and to relieve Gulf from any implied obligation to develop this block for the benefit of Tidelands. However, as discussed above, these provisions do not *necessarily* mean that there can be no implied covenant to protect against drainage under the 1951 Agreement—because this covenant is "separate and distinct" from the obligation to drill wells or develop the lease. *Foster v. Atlantic Refining Co.,* 329 F.2d 485. This is the law in Louisiana, as well as in Texas. *Williams v. Humble Oil & Refining Co.,* 432 F.2d 165 (applying Louisiana law); *Stanolind Oil & Gas Co. v. Christian,* 83 S.W.2d 408 (Texas law).

**c. Drainage Caused by Gulf**

Indeed, both Louisiana and Texas recognize that the need for an implied covenant against drainage may be particularly great where the drainage is being caused by the lessee's own operations on adjacent land. *Shell Oil Co. v. Stansbury,* 410 S.W.2d at 188; *Williams v. Humble Oil & Refining Co.,* 432 F.2d at 175. This is, in fact, demonstrated by the present case.

If the drainage of Block 332 was the result of operations conducted by a third party on adjacent land, then the interests of Gulf and Tidelands in preventing this drainage would coincide. Gulf, as well as Tidelands, would be damaged by the drainage—so Gulf could be expected to drill offset wells on this block in order to protect its own economic interests.

However, if the drainage of Block 332 were caused by the operations of Gulf itself on adjacent property, then the interests of Gulf and Tidelands no longer coincide. Gulf would have no incentive to protect against this drainage because the drainage would actually benefit Gulf; through it, Gulf would be able to recover gas from Block 332 without the expense of drilling and operating a protection well—and without paying overriding royalties and production payments to Tidelands.

Moreover, this situation is compounded by the fact that all of the submerged land is owned by the federal government, which is the lessor of Blocks 332 and 333. If this were not so—i.e., if there were different owners of both blocks—then the lessor, as well as Tidelands, would be damaged by the drainage—and the lessor could be expected to enforce the implied covenant against drainage. However, since the government is the lessor on both adjoining blocks, it has no incentive to protect against the drainage of Block 332, because it recovers any such drainage through production under the lease on Block 333.

An almost identical situation was presented in *Cook v. El Paso Natural Gas Co.,* 560 F.2d 978 (10th Cir.1977). There, the court held than an overriding royalty owner had standing to enforce an implied covenant against drainage—where the drainage was being caused by the lessee's operations on adjacent property and where the federal government was the lessor on both the drained and the draining tracts. The opinion states:

"Also to be noted is that in the case at bar the plaintiff is in a very difficult position due to the fact that the lessor has no incentive to bring an enforcement

action because the United States, the lessor, is collecting its royalty both from the E ½ of Section 29 and from the W ½ as well. Since the United States is not being deprived of anything, the only thing remaining is for the plaintiff to bring the action herself. It is impossible to say that she lacks standing or interest to bring the action since she is the only one who has a pecuniary interest which is affected." (560 F.2d at 987.) [27]

This is equally true in the present case. Gulf's drainage of gas from Block 332, through its operations on the adjoining block, benefits Gulf. This drainage does not damage the federal government because, as lessor, it recovers any lost gas through Gulf's production on Block 333. The only party injured by the drainage is Tidelands; and, its only remedy is by enforcing an implied covenant against drainage caused by Gulf.

It is clear that the parties to the 1951 Agreement did not intend to permit Gulf to engage in acts which would destroy or damage a material portion of the consideration for the sale of the geophysical data, the production payments and overriding royalties due Tidelands. Moreover, the provisions excusing Gulf from drilling on Block 322 were certainly not intended to immunize Gulf from its own drainage of gas from this property. *Coyle v. North American Oil Consol.*, 9 So.2d at 478–79; *Danciger Oil & Refining Co. v. Powell*, 154 S.W.2d at 635. Certainly, there is such "contrary provision" in the basic agreement which relieves Gulf of the duty to protect against its own drainage. *Bolton v. Coats*, 533 S.W.2d at 916.

Therefore, "in order to give effect to and effectuate the purpose of the [1951 Agreement] as a whole," this Court holds that—under the law of both Louisiana and Texas—there is an implied covenant obligating Gulf to protect Tidelands' interests from drainage caused by Gulf's own operations on adjacent property. See *Williams v. Humble Oil & Refining Co.*, 432 F.2d 165; *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187.

**d. Drainage Caused by Others**

■ This implied covenant, however, does not extend to any drainage of gas from Block 332 by the operations of third parties on adjoining lands. It is not necessary to imply the existence of such a covenant in order to effectuate the 1951 Agreement.

The parties expressly provided that Gulf shall have no obligation to "drill any well or to develop any lease," and that Gulf "shall never at any time be under any duty to drill for or produce oil, gas or other minerals from any area subject to this agreement, notwithstanding the existence of producing wells thereon." There is nothing in the Agreement that would indicate the parties intended to limit or restrict Gulf's discretion under these provisions in the event that third parties were draining gas from Block 332.

Indeed, unlike the situation involving Gulf's own drainage, it is reasonable to assume that the parties to the 1951 Agreement were aware that the interests of Tidelands and Gulf in preventing third party-drainage were identical. That is, since any drainage of gas from Block 332 by the operations of third parties on adjacent land would damage Gulf as well as Tidelands, Gulf could be expected to protect its own economic interests—and, consequently, the overriding royalties and production payments of Tidelands—by drilling offset wells or taking other steps to prevent this drainage. See *Cook v. El Paso Natural Gas Co.*, 560 F.2d 978; *Williams v. Humbel Oil & Refining Co.*, 432 F.2d 165; *Shell Oil Co. v. Stansbury*, 410 F.2d 187.

Moreover, there is no evidence in the summary judgment record which establishes that operations by third parties on adja-

---

27. Since the lessor was not able to drill a protection well on the property in questioin—the United States Geological Survey had entered an order prohibiting the drilling of an oil or gas well on it—the court also held that the plaintiff could recover "compensatory royalties" for breach of the implied covenant to protect against drainage. *Cook*, 560 F.2d at 982.

cent land are causing drainage of gas from Block 332. The only specific allegation in the complaint concerns drainage by Gulf's own operations on Block 333. And there is not even an indication of the names of the companies which hold leases on the other blocks surrounding Block 332.

## 7. CONCLUSIONS

This case differs from the typical drainage case arising out of an oil and gas lease because the leases from which Tidelands is entitled to receive overriding royalties and production payments were not yet in existence at the time the parties executed the 1951 Agreement. However, these leases were in existence when successive assignments of overriding royalties and production payments were granted by Gulf to Tidelands in accordance with terms of the Agreement.

The question of the existence of an implied covenant to protect against drainage under an agreement of this type does not appear to have been directly addressed by the courts. However, for the reasons discussed in this opinion, the same factors that have caused courts to recognize implied covenants under oil and gas leases to protect the royalties reserved—and under assignments of oil and gas leases to protect the overriding royalties reserved—compels the implication of a covenant under this 1951 Agreement obligating Gulf to protect Tidelands' interests from drainage caused by Gulf's own operations on adjacent property. Tidelands' motion for partial summary judgment is granted to this extent.

Of course, *the question of whether or not Gulf has breached this implied covenant*—by failing to take such steps as a reasonably prudent operator would have taken to protect the producing gas sands under Block 332 from drainage by wells on Block 333—*involves disputed issues of fact.* Similarly, the question of the relief, if any, to which Tidelands is entitled if Gulf breached the implied covenant also involves contested fact issues. Accordingly, these matters remain for disposition by trial.