**TIDELANDS ROYALTY "B" CORP.,**
**Plaintiff-Appellee,**

v.

**GULF OIL CORPORATION,**
**Defendant-Appellant.**

**No. 85–1506.**

United States Court of Appeals,
Fifth Circuit.

Dec. 2, 1986.

Rehearing Denied Jan. 14, 1987.

Gene W. Lafitte, New Orleans, La., C. Steven Matlock, D.L. Case, Dallas, Tex., Deborah Bahn Price, New Orleans, La., for defendant-appellant.

Leo Hoffman, Kenneth S. Beat, Dallas, Tex., John M. McCollam, Robert B. Wiygul, New Orleans, La., for plaintiff-appellee.

Before WISDOM, DAVIS, and JONES, Circuit Judges.

WISDOM, Circuit Judge:

This appeal presents a question of first impression involving oil and gas law. The question is whether, under Louisiana law, the grant of an overriding mineral royalty by a mineral lessee imposes an implied obligation on the lessee to protect the royalty owner from drainage caused by the lessee's operations on adjacent lands.[1]

---

1. The district court found that it had jurisdiction of this action under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1) (1982), and that § 1333(a)(2), (4) of the Act required application of the law of the state adjacent to the contested mineral operations, which, in this case, is Louisiana. These findings are correct and are not challenged on appeal.

Although this appeal is from an interlocutory order, we have jurisdiction under 28 U.S.C. § 1292(b). The trial court certified the question to this court and we granted permission to

We answer neither affirmatively nor negatively. Instead, we answer the question with another question: is the diminution of the royalty owners' payments the result of a breach of the lessee's implied obligation to act in good faith with respect to the interest of the royalty owner? Because the district court did not address this second question, we remand the case for further proceedings.

## I. The Facts and Proceedings Below

This case arises from an agreement in 1951 between Gulf Oil Corporation ("Gulf") and the predecessors of Tidelands Royalty "B" Corporation ("Tidelands"). The object of the agreement was the sale to Gulf of confidential geophysical data covering 2,700,000 acres of offshore lands off the Louisiana coast. The consideration for this data was $2,000,000 and the promise to grant overriding royalties in any leases obtained over certain tracts designated in the agreement.[2] Gulf was successful in obtaining leases from the federal government for Blocks 332 and 333 in the West Cameron Area off the coast of Louisiana. Block 333 is not within the area subject to the agreement, but 4,062 acres of Block 332 are covered by the agreement. Fulfilling its obligation under the agreement, Gulf assigned an overriding royalty interest to Tidelands covering the 4,062 acres and incorporating the terms of the 1951 agreement.

Gulf began operations on its leases. After drilling a dry well in Block 332, a successful gas well was completed in Block 333. From a drilling platform later erected on Block 333, five more wells were directionally drilled. Gulf completed two wells in Block 332 and three wells in Block 333. At least two of the wells in Block 333 are draining gas from reservoirs that underlie both blocks.

Tidelands brought this suit contending that Gulf breached an implied covenant to protect Tidelands from drainage caused by Gulf's operations in Block 333. Gulf admitted the fact of drainage, but argued that the 1951 agreement precludes the implication of an obligation to protect against drainage. On Tidelands' motion for partial summary judgment, the trial court held that "there is an implied covenant under the 1951 Agreement which requires Gulf to protect Tidelands' interests from drainage *by Gulf's own operations.*"[3] Gulf appeals from this holding.

## II. The Nature of the Relationship Between Gulf and Tidelands

■ The agreement between Gulf and Tidelands does not expressly create an obligation to protect against drainage. Implied obligations, however, are common in mineral leases. For example, there is no doubt that a lessee has an implied obligation to protect his lessor from drainage.[4] This obligation derives from the basic obligation of the lessee to act as "a reasonably

present this appeal by our order of August 13, 1985.

2. The tracts covered by the agreement were designated and subdivided into arbitrary "units". All production from a single unit was subject to a production payment of $\frac{1}{8}$ of the minerals produced up to a maximum of $1,500,000 and then an overriding royalty of $\frac{1}{24}$ thereafter. The promise to grant overrides was to exist for 50 years.

3. *Tidelands Royalty "B" Corp. v. Gulf Oil Corp.,* 611 F.Supp. 795, 798 (N.D.Tex.1985) (emphasis in original). The district court also held that the implied covenant did not extend to the protection against drainage caused by the opera-

tions of third persons. 611 F.Supp. at 808. The parties do not contest this holding. Furthermore, because of our analysis of the issue, separation of the issue into the obligation to protect from drainage caused by one's own operations and drainage caused by another's operations is unnecessary. *See* text accompanying notes 49–50.

4. *Williams v. Humble Oil & Refining Co.,* 432 F.2d 165, 172, *reh'g denied,* 435 F.2d 722 (5th Cir.1970), *cert. denied sub nom. Humble Oil & Refining Co. v. Price,* 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971); *Breaux v. Pan American Petroleum Co.,* 163 So.2d 406, 415 (La.App. 3d Cir.), *writ denied,* 246 La. 581, 165 So.2d 481 (1964).

prudent operator".[5] The existence of drainage does not necessarily indicate a breach of any implied obligation. Rather, a breach is shown only upon proof that the lessee neglected to take the same economically feasible steps that a reasonably prudent operator would have taken to protect against the drainage.[6]

The district court of course noted that the agreement between Gulf and Tidelands is not a mineral lease.[7] The court concluded, however, that the implied obligations attending a mineral lease also attend overriding royalty interests.[8] This finding serves as the premise for the district court's holding. We do not accept it as dispositive of this case, because it does not take into consideration the different relationships from which overriding royalties are created.

■ The district court relied on the Louisiana case of *Wier v. Grubb*[9] and two Texas cases, *Bolton v. Coats*[10] and *Phillips Petroleum Co. v. Taylor*[11] in concluding that the implied obligations in mineral leases apply to overriding royalties.[12] In each of these cases, the overriding royalty was created in the context of a sublease agreement; the original lessee assigned his interest to another and retained an overriding royalty.[13] Under Louisiana law, the assignment of a lease with the retention of an overriding royalty creates a sublease, regardless of how the parties style their agreement.[14] Therefore, the cases cited by the district court support only the proposition that a sublessor is entitled to the protection of the same implied obligations that protect the original lessor.[15] Because Tidelands is not Gulf's sublessor, these cases are not dispositive in defining Gulf's implied obligations to Tidelands.[16]

As in this case, royalty interests may be created outside of the lessor-lessee relation-

**5.** La.Rev.Stat.Ann. 31:122 & Comment (West 1975).

**6.** *See Williams v. Humble Oil & Refining Co.*, 432 F.2d 165, 172–73, *reh'g denied*, 435 F.2d 772 (5th Cir.1970), *cert. denied sub. nom. Humble Oil & Refining Co. v. Price*, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971).

**7.** 611 F.Supp. at 769.

**8.** *Id.* at 804–05.

**9.** 228 La. 254, 82 So.2d 1 (1955).

**10.** 533 S.W.2d 914 (Tex.1975).

**11.** 116 F.2d 994 (5th Cir.1941) (applying Texas law).

**12.** *Tidelands,* 611 F.Supp. at 804, 805.

**13.** *See Wier,* 228 La. at 263, 82 So.2d at 4; *Bolton,* 533 S.W.2d at 915; *Phillips Petroleum,* 116 F.2d at 995.

**14.** *Broussard v. Hassie Hunt Trust,* 231 La. 474, 481–82, 91 So.2d 762, 764 (1956).

**15.** For this reason, *Cook v. El Paso Natural Gas Co.,* 560 F.2d 978 (10th Cir.1977), relied upon by the district court, is also inapplicable. The district court found *Cook* particularly instructive because of its similar facts: the overriding royalty owner suffered drainage caused by the lessee's operations on an adjacent tract and the federal government was the lessor of both the drained and draining tracts. The situation in *Cook* is different from our situation, however, because the royalty owner in *Cook* was the original lessee and acquired her royalty by reservation under a sublease. *See Cook,* 560 F.2d at 980.

**16.** The district court did note that the cases on which it relied concerned overriding royalties created by reservation in a sublease rather than those created by grant. 611 F.Supp. at 802 n. 16. It found, nonetheless, that "there is no basis for a legal distinction between overriding royalties created by grant, and those created by reservation." *Id.* (citing 2 Williams & Meyers, *Oil and Gas Law* § 418 (1985); M. Merrill, *Covenants Implied in Oil and Gas Leases* § 191 (1940)). This finding may be appropriate if this case were not governed by Louisiana law. In most other jurisdictions, the royalty owner is protected by the same or similar implied obligations regardless of the source of that royalty. *See Part III* of this opinion. In Louisiana, however, the nature of the rights that attend a royalty interest depend on nature of the contractual relationship from which the royalty was created. H. Daggett, *Mineral Rights in Louisiana* 250 (1949). If the royalty is held by one who is not a lessor, the rules governing the lessor-lessee relationship do not apply. *Uzee v. Bollinger,* 178 So.2d 508, 513 (La.App. 1st Cir.1965). Moreover, the grant of royalty interest outside of the lease context usually creates a much lower degree of duty to the royalty owner. *See Part III* of this opinion. Therefore the distinction between royalties created by the lessee's reservation and those created by his grant is important in Louisiana.

ship. A landowner may convey a royalty interest in his land before leasing or may convey a portion of his reserved royalty in an existing lease.[17] The creation of a royalty interest by these means establishes an executive-nonexecutive relationship. The landowner holds an executive interest—the exclusive right to grant leases on the subject tract.[18] The royalty owner holds a nonexecutive interest—an interest that does not include the right to grant leases.[19] The distinguishing characteristic of a nonexecutive royalty interest is its "passive" nature.[20] The royalty owner has no right to explore, develop, or lease the subject tract.[21] Moreover, the landowner has no obligation to develop or lease the premises for the benefit of the royalty owner.[22] Although the nonexecutive royalty owner may be dependent solely on the executive's will to realize the potential value of his royalty, the realization that the landowner also has an interest in leasing and development justifies the gamble of purchasing the royalty.[23]

█ We find that the rules governing the executive-nonexecutive relationship ap-

ply to the relationship between Gulf and Tidelands. Tidelands has only a passive interest in the tracts subject to its overriding royalty. It has no right to produce or explore for minerals in the tracts, nor is it obligated to share the costs of production. The agreement specifically negates any duty of Gulf to acquire leases on the tracts or develop any leases that may be acquired.[24] In these respects, the relationship between Gulf and Tidelands is consistent with the description of an executive-nonexecutive relationship.

█ In contrast, the relationship of the parties here is inconsistent with a lessor-lessee relationship. A lessee undertakes an affirmative, implied obligation to develop the leased premises.[25] The parties specifically agreed that Gulf did not have this duty. Moreover, the lessor surrenders his exclusive right to explore for and produce minerals in exchange for the lessee's obligation to develop and protect from drainage.[26] Unlike a lessor or sublessor, Tidelands had *no* interest in the tracts when it

---

17. 2 Williams & Meyers, *Oil and Gas Law* § 203 at 26 (1985); H. Daggett, *supra* note 16, at 258. Professor Daggett identifies this type of royalty as one of the two larger classifications of royalties—the other being the "lessor's royalty". *Id.* at 256.

18. La.Rev.Stat.Ann. 31:105, 116 (West 1975).

19. *Id.* 31:108.

20. *Continental Oil Co. v. Landry,* 215 La. 518, 524, 41 So.2d 73, 75 (1949); H. Daggett, note 16, at 250.

21. *Continental Oil Co. v. Landry,* 215 La. 518, 526, 41 So.2d 73, 75 (1949); *St. Martin Land Co. v. Pinckney,* 212 La. 605, 619, 33 So.2d 169, 174 (1947) (Hamiter, J., concurring).

22. *Humble Oil & Refining Co. v. Guillory,* 212 La. 646, 673, 33 So.2d 182, 192 (1947); *St. Martin Land Co. v. Pinckney,* 212 La. 605, 622, 33 So.2d 169, 175 (1947) (Hamiter, J., concurring); *see also* La.Rev.Stat.Ann. 31:109 (West 1975).

23. *St. Martin Land Co. v. Pinckney,* 212 La. 605, 626, 33 So.2d 169, 175–76 (1947) (Hamiter, J., concurring).

24. Paragraph II(b)(2) of the 1951 agreement provides:

The procedure herein set forth for determining the number of "productive acres" is not intended to impose any duty on [Gulf] to drill for oil or gas, or other minerals, according to any particular spacing density, it being the intention of the parties hereto that [Gulf] shall never at any time be under any duty to drill for or produce oil, gas or other minerals from any area subject to this agreement, notwithstanding the existence of producing wells thereon.

Similarly, Paragraph IV provides:

Nothing in this agreement shall ever obligate [Gulf] to acquire any lease or leases or to drill any well or to develop any lease or leases if acquired. The oil payment and overriding royalty provision set out herein shall apply to oil, gas and other minerals only when, as and if produced, saved and sold by [Gulf] or its assigns.

25. La.Rev.Stat.Ann. § 31:122 & Comment (West 1975); *Breaux v. Pan American Corp.,* 163 So.2d 406, 409 (La.App. 3d Cir.), *writ denied,* 246 La. 581, 165 So. 481 (1964).

26. *Williams v. Humble Oil & Refining Co.,* 432 F.2d 165, 172, *reh'g denied,* 435 F.2d 772 (5th Cir.1970), *cert. denied sub. nom. Humble Oil & Refining Co. v. Price,* 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971).

sold the geophysical data in exchange for cash and possible overriding royalties. Finally, the lessor does not dispose of his interest, he only leases it. Thus, the lessee must reasonably develop the property or lose his lease; otherwise, the lessee could permanently deprive the lessor of his reversionary interest in the minerals underlying the leased land.[27] Tidelands, on the other hand, has no reversionary mineral interest in the tracts being drained. Its only "interest" in the tracts was its compilation of geophysical data concerning those tracts, which it disposed of in exchange for $2,000,000 and possible overriding royalties.[28] Accordingly, Gulf's obligation to Tidelands to protect against drainage should not be determined under the "reasonably prudent operator" standard imposed on a mineral lessee. Instead, Gulf's obligations should be determined under the standard of care owed to a nonexecutive royalty owner by his grantor.

---

**27.** *See Wier v. Grubb,* 228 La. 254, 269–70, 82 So.2d 1, 6–7 (quoting *Sauder v. Mid-Continent Petroleum Corp.,* 292 U.S. 272, 280–81, 54 S.Ct. 671, 674, 78 L.Ed. 1255 (1934)).

**28.** Similarly, if a landowner *sells* his land and reserves a royalty (as opposed to leasing his land and reserving a royalty), his rights as a royalty owner are those arising from an executive-nonexecutive relationship rather than from a lessor-lessee relationship. *See Sparks v. Anderson,* 465 So.2d 830 (La.App. 2d Cir.), *writ denied,* 467 So.2d 538 (La.1985); *Uzee v. Bollinger,* 178 So.2d 508, 513 (La.App. 1st Cir.1965).

**29.** 178 So.2d 508 (La.App. 1st Cir.1965).

**30.** The royalty owner purchased a ¼ royalty interest in all royalties paid under future leases. The landowner-executive negotiated a lease that provided for a total royalty of ¼ of production. This royalty was divided, however, into a "base" royalty of ⅛ and "overriding" royalties of ⅛. Under the law then in effect, the royalty owner's share was computed from the "base" royalty. The overriding royalty was considered "bonus", however, and belonged solely to the landowner. Therefore, the royalty owner's share of production was ¼ of ⅛, or ¹⁄₃₂. Had the landowner negotiated for a single base royalty of ¼, the royalty owner's share would have been ¼ of ¼, or ¹⁄₁₆. By the expediency of his transaction, the landowner was able to increase his share of the royalties by decreasing the royalty owner's share.

## III. The Nature of the Duty Owed to the Nonexecutive Royalty Owner

Before 1975, Louisiana courts declined to recognize any implied duties arising from the executive-nonexecutive relationship. In *Uzee v. Bollinger,*[29] the Louisiana First Circuit upheld the right of the executive to execute a lease with terms that favored the executive at the expense of the nonexecutive royalty owner.[30] The *Uzee* court held that the executive did not act as a fiduciary,[31] nor was he under a duty "to deal fairly and in good faith".[32] In a similar situation, the Louisiana Supreme Court approved the holding of *Uzee* in *Gardner v. Boagni.*[33] These decisions followed earlier ones that had recognized the executive's right to refrain from leasing so that the royalty interest burdening his right would expire by prescription.[34] Louisiana jurisprudence contrasted with that of most states, which recognize an implied duty in the executive-nonexecutive relationship ranging from that of "good faith and fair dealing" to that of a fiduciary.[35]

---

**31.** *Uzee,* 178 So.2d at 512.

**32.** *Id.* at 513.

**33.** 252 La. 30, 41–42, 209 So.2d 11, 15 (1968).

**34.** *E.g., Humble Oil & Refining Co. v. Guillory,* 212 La. 646, 33 So.2d 182 (1946); *Vincent v. Bullock,* 192 La. 1, 187 So. 35 (1939); *Spiner v. Phillips Petroleum Co.,* 94 F.Supp. 273 (W.D.La. 1950).

**35.** *See J.M. Huber Corp. v. Square Enterprises, Inc.,* 645 S.W.2d 410, 414 (Tenn.Ct.App.1982); 2 Williams & Meyers, note 17, § 339.2; Comment, *Implied Duties and the Executive Right,* 30 La.L. Rev. 139, 149 (1969). An apt comparison can be made between *Uzee* and *Manges v. J.C. Guerra,* 673 S.W.2d 180, 183 (Tex.1984) (executive-nonexecutive relationship gives rise to a "fiduciary duty"). Although the enactment of the Mineral Code in 1975 limited the holding of *Uzee, see* text accompanying notes 36–38, the Mineral Code does not impose a fiduciary duty on the executive. *See* La.Rev.Stat.Ann. 31:109 & Comment (West 1975). The comparison of *Uzee* and *Manges* illustrates the differences between Louisiana and Texas law in this area and, thus, the inappropriateness of reliance on Texas law.

■ The duties of the executive were addressed by the legislature in 1975 with the enactment of the Mineral Code. Article 109 of the Mineral Code provides:

> The owner of the executive interest is not obligated to grant a mineral lease, but in doing so, he must act in good faith and in the same manner as a reasonably prudent landowner or mineral servitude owner whose interest is not burdened by a nonexecutive interest.[36]

The purpose of this article is to overrule the decisions in *Uzee* and *Gardner* "insofar as they hold that the executive owes no duty whatsoever to the nonexecutive." [37] To this extent, the official comment to article 109 indicates that the standard imposed on the executive is that suggested by Williams and Meyers in their treatise, *Oil and Gas Law.* [38]

Williams and Meyers articulate the standard of an "ordinary, prudent landowner, not burdened by an outstanding non-executive interest" to govern all aspects of the executive's conduct.[39] Under this standard, the executive may not refuse to lease simply to allow the royalty owner's interest to expire.[40] An affirmative duty to protect against drainage may also be derived from this standard.[41] Article 109 negates, however, any affirmative duty of the executive to act to protect the nonexecutive's interest. Specifically, it does not require the executive to lease the land burdened by the royalty. The only express duty created by article 109 is to act in good faith in granting a lease. Enactment of the Mineral Code, therefore, did not completely overrule past jurisprudence in favor of the principles followed in other jurisdictions and summarized by Williams and Meyers. Indeed, the express provisions of article 109 do not squarely apply to this case. Nevertheless, the article does reflect an alteration in the principles governing the executive-nonexecutive relationship, which, we have decided, do govern this case.

The Mineral Code preserves the rule of the earlier jurisprudence that the nonexecutive royalty interest is passive and is not generally protected by any implied affirmative duties of the grantor of that right absent a lessor-lessee relationship. The royalty owner's interest is speculative: a hope that the grantor's own interest in securing production will, in fact, result in production from the tract burdened by the royalty. If this hope fails to materialize because of the grantor's inaction, the royalty owner has no complaint.[42]

On the other hand, once the grantor of a royalty interest does exercise his development rights, he must act with good faith towards the interests of the royalty owner.[43] The grantor need not act contrary to

---

**36.** La.Rev.Stat.Ann. 31:109 (West 1975). Although the Mineral Code became effective in 1975, twenty four years after the 1951 agreement, its provisions are applicable in this case. First, the overriding royalties were assigned to Tidelands on October 30, 1975; the effective date of the Mineral Code was January 1, 1975. La. Acts 1974, No. 50. Second, even though the assignment was made pursuant to an earlier agreement, the provisions of the Mineral Code are to be applied retroactively except when retroactive application would violate constitutional rights. La.Rev.Stat.Ann. 31:214 (West 1975).

**37.** *Id.* Comment.

**38.** *Id.* (citing 2 Williams & Meyers, note 17, § 339.2 at 209–10).

**39.** 2 Williams & Meyers, note 17, § 339.2 at 209–10.

**40.** *Id.* § 339.3 at 214.

**41.** *Id.* at 212–13.

**42.** The situation in *Spiner v. Phillips Petroleum Co.,* 94 F.Supp. 273 (W.D.La.1950) provides an example of this principle and is somewhat analogous to the case before us. The plaintiff acquired a royalty interest on a certain tract from the landowners, who later executed a lease on that tract. The lessee completed a well on a neighboring tract but failed to develop the tract on which the plaintiff held his royalty. The plaintiff sued his grantors and their lessee alleging damages from drainage and nondevelopment. The court dismissed the claims and held that the grantors of the royalty and their lessee were under no duty to drill or unitize the tract for the benefit of the royalty owner. *Id.* at 275–79.

**43.** This solution was urged before the enactment of the Mineral Code in Comment, *Implied Duties and the Executive Right,* 30 La.L.Rev. 139, 148, 151 (1969). It is also consistent with

the conduct of a reasonable landowner nor his own economic interests to fulfill his duty of good faith.[44] Good faith requires only that the grantor avoid structuring his conduct to gain an advantage that is derived solely by avoiding the burden of the royalty.[45] If the conduct of the grantor is supported by reasons other than merely the advantage of avoiding the royalty burden, the standard of good faith may be fulfilled even though the royalty owner is harmed.[46] These considerations are embodied in the standard articulated by article 109 as "a reasonable prudent landowner or mineral servitude owner whose interest is not burdened by a nonexecutive interest."

### IV. Application of the Standard of Good Faith to Gulf's Conduct

■ The trial court concluded that Gulf assumed an implied duty to protect Tidelands from drainage caused by Gulf's operations on Block 333 by taking "such steps as a reasonably prudent operator would have taken".[47] This standard of conduct, that of a lessee to his lessor, imposes an affirmative duty on Gulf to take economically feasible steps to protect Tidelands from drainage.[48] We have concluded, however, that the obligation of good faith implicit in the relationship between Gulf and Tidelands does not create an affirmative duty on Gulf to protect Tidelands' interest.

■ The trial court found that the circumstance that Gulf's own operations is causing the drainage supported imposition of a more stringent duty on Gulf. In *Breaux v. Pan American Petroleum Corp.*,[49] the Louisiana Third Circuit held that the lessee is bound by the same standard of conduct regardless of whether drainage is caused by his own operations or by those of another.[50] We followed the rule of *Breaux* in our opinions in *Williams v. Humble Oil & Refining Co.*[51] Gulf's conduct should be governed by the same standard even though it is responsible for the drainage from Block 332.

■ In its argument on appeal, Gulf maintains that the terms of the 1951 agreement preclude the implication of any duty that would serve to protect Tidelands from drainage. The agreement does provide language that expressly precludes an obligation on Gulf to drill or develop the tracts.[52] This language could be read as specifically precluding an obligation to drill offset wells to protect against drainage. Whether the language should be given this interpretation is of no immediate concern because we have decided that, more broadly, it negates the existence of a lessor-les-

the codal principle that all contracts must be performed in good faith, La.Civ.Code Ann. art. 1759 (West Special Pamphlet 1986) (previously La.Civ.Code art. 1901 (1870)), and which is applicable to mineral contracts. La.Rev.Stat.Ann. 31:2, 31:3 Comment (West 1975).

**44.** *Sparks v. Anderson*, 465 So.2d 830, 835 (La. App. 2d Cir.) (applying good faith standard of article 109), *writ denied*, 467 So.2d 538 (La. 1985).

**45.** *See* 2 Williams & Meyers, note 17, § 339.3 at 210.

**46.** *See Sparks v. Anderson*, 465 So.2d 830, 834–35 (La.App. 2d Cir.), *writ denied*, 467 So.2d 538 (La.1985).

**47.** *Tidelands*, 611 F.Supp. at 809.

**48.** *See* notes 5–6 and accompanying text.

**49.** 163 So.2d 406 (La.App. 3d Cir.), *writ denied*, 246 La. 581, 165 So.2d 481 (1964).

**50.** *Id.* at 416–17. Moreover, the *Breaux* court conceded that it reached a conclusion contrary to that reached by other jurisdictions. *Id.* at 416. It expressly declined to follow the cases of *Humphreys Oil Co. v. Tatum*, 26 F.2d 882 (5th Cir.), *cert. denied*, 278 U.S. 633, 49 S.Ct. 31, 73 L.Ed. 550 (1928) and *Trimble v. Hope Natural Gas Co.*, 113 W.Va. 839, 169 S.E. 529 (1933), two cases relied upon by the district court. *Compare Tidelands*, 611 F.Supp. at 802 *with Breaux*, 163 So.2d at 416.

**51.** 432 F.2d 165, 172–73, *reh'g denied*, 435 F.2d 772, 773 (5th Cir.1970), *cert. denied sub. nom. Humble Oil & Refining Co. v. Price*, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971). Contrary to Tidelands' argument, our opinions in *Williams* do not limit the holding of *Breaux* in this regard. Our only departure from *Breaux* was the conclusion that *Breaux* did not control the issue of notice because the issue was not addressed in *Breaux*. *Williams*, 435 F.2d at 773.

**52.** *See* note 24.

see type of relationship that would give rise to an implied, affirmative obligation to protect against drainage. The language cannot be read, however, to negate the minimal duty of good faith. Provisions in derogation of the implied obligations in a mineral contract are strictly construed.[53] "Clear and unequivocal" language is necessary to indicate that the parties intended to reduce the standard of conduct owed under the contract.[54] Even if the contract purported to eliminate all implied duties, public policy probably requires no less than a standard of good faith.[55]

■■■ Having undertaken development of the offshore tracts, Gulf is obligated to act in good faith with respect to Tidelands' interests. To prevail on its claims, Tidelands must show that a reasonable operator in Gulf's position would have conducted its development differently had there been no royalty interest burdening the tract within Block 332. Merely showing that there are economically feasible steps that Gulf could undertake to protect Tidelands from drainage is insufficient to meet this burden. Gulf need not act to its economic detriment by drilling two wells—one on Block 333 and one on Block 332—to drain the same reservoir that could be more efficiently drained by one well, even though both wells would be profitable.[56] Nor is Gulf obligated to undertake any other affirmative steps to protect Tidelands if such steps have no economic benefit to Gulf.[57]

■■■ If, however, Tidelands can show that Gulf would have drilled on Block 332, instead of Block 333, to drain a common reservoir *but for* the advantage of avoiding royalty payments, then Tidelands would show a breach of good faith. Gulf may decide what location or locations are most efficient to drain a reservoir. In doing so, however, Gulf must make its decision as if Tidelands' royalty interest did not exist. It may not locate a well outside of the tract subject to Tidelands' royalty when the available evidence indicates that the most efficient location is inside the tract. Drilling outside of the tract burdened by Tidelands' royalty in such a situation would create an advantage that derived solely from the avoidance of Tidelands' royalty and would constitute a breach of good faith.

■■■ The district court decided only that an obligation to protect against drainage existed in favor of Tidelands. It did not decide whether that obligation had been breached, because that question involved disputed issues not yet resolved. Similarly, we cannot decide whether Gulf has breached its obligation of good faith because this question requires consideration of facts not resolved on the record. Indeed, Tidelands' complaint does not make allegations sufficient to create a material dispute concerning the good faith of Gulf's conduct. We find that the interests of justice require, however, that on remand Tidelands be allowed to amend its complaint to allege a breach of Gulf's obli-

---

**53.** *Williams,* 432 F.2d at 177.

**54.** *Id.*

**55.** *See* La.Rev.Stat.Ann. 31:3 & Comment (West 1975).

**56.** This example illustrates the practical difference between the implied duty owed a lessor and that owed a nonexecutive royalty owner. In a common drainage situation, the lessee owes his lessor an obligation to drill an offset well or to unitize the adjoining tracts even if contrary to his economic interests unless such action will leave him without any profit. *See Williams,* 432 F.2d at 173–74. In the executive-nonexecutive situation, however, the executive need not act contrary to his legitimate economic interests.

**57.** Louisiana law recognizes that a lessor may prove a breach of the lessee's obligation to protect against drainage by also showing an unreasonable failure to seek unitization or voluntary pooling of the drained and draining tracts. *Williams,* 432 F.2d at 173; *Breaux,* 163 So.2d at 415–16. Under our analysis of Gulf's duty, Gulf is not obligated to affirmatively seek unitization of Blocks 332 and 333 for Tidelands' benefit. If Gulf does undertake pooling arrangements concerning Block 332, however, it must act in good faith with respect to Tidelands' interest. Gulf may not exclude Tidelands from any pooling arrangement or act inconsistently in its pooling of production from Block 332 solely to avoid payment of additional royalties to Tidelands.

gation of good faith under the standards that we have set forth. Finally, we note that if Tidelands is unable to raise a material dispute over whether Gulf has breached its obligation of good faith conduct, summary disposition of this case would be appropriate.

*Conclusion*

The implied obligation to protect against drainage is well recognized and understood in the lessor-lessee relationship, the typical situation giving rise to a royalty interest. That obligation is fundamentally different from the implied obligation of good faith arising from the executive-nonexecutive relationship, the other common situation giving rise to a royalty interest. This case involves, however, an atypical oil and gas agreement. The relationship between the parties is neither that of a lessor and lessee nor that of an executive and nonexecutive. Nevertheless, an examination of the nature of the agreement in this case leads to the conclusion that Gulf's implied duty towards Tidelands is only one of good faith—the standard of conduct implicit in an executive-nonexecutive relationship. Whether Gulf is liable to Tidelands for the drainage caused by Gulf's operations on Block 333 depends on whether Gulf has breached its obligation of good faith in conducting its development of the gas sands underlying the tract burdened by Tidelands royalty.

The opinion of the district court is REVERSED and the case remanded for further proceedings consistent with this opinion.