In the Matter of SENIOR-G & A OPERATING CO., INC., Debtor.

PSI, INC. OF MISSOURI, Appellant,

v.

H. Kent AGUILLARD, et al., Appellees.

No. 91-4026.

United States Court of Appeals,

Fifth Circuit.

April 13, 1992.

Appeal from the United States District Court for the Western District of Louisiana.

Before WISDOM, JOLLY, and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

PSI appeals from an order of the bankruptcy court, affirmed by the district court, holding it liable, as a secured creditor receiving a benefit, for a portion of the cost of reworking an oil well in which Senior, the bankrupt debtor, held a working interest. For the reasons set out below, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.

I

A

Senior owned a number of oil and gas producing properties, among which was the U. Richard No. 2, 2-D Well. In July of 1988, Senior needed cash. In return for the sum of $5,100,000 from PSI, Senior entered into what was called by the parties a "Production Payment Loan Agreement" (the Agreement). Under the terms of the Agreement, Senior conveyed PSI the right to production payments

totalling $12,750,000 from a number of wells owned by Senior, including the U. Richard No. 2, 2-D Well (the well). The Agreement specified that the arrangement was to be treated as a loan for tax purposes. The Agreement also specifically stated that "[t]he Production Payment granted hereby shall constitute a lien upon the Subject Minerals covered hereby."

At the time of the Agreement, the well was subject to a 30% royalty burden; Senior owned a 70% working interest. The Agreement gave PSI the right to production payments amounting to 85% of the 70% working interest revenues or a net revenue interest of 59.5%. Sometime after entering the Agreement, Senior conveyed most of its working interest in the well to Baxter Drilling and Exploration and its affiliates (Baxter) and retained only 10% of the 70% working interest. At this point, ownership under the well was as follows:

| Royalty burden | 30 | % | | |
|---|---|---|---|---|
| Baxter 80% × 70% | Working | Interest | 56 | |
| Senior 10% × 70% | 0 | 0 | 7 | |
| Others 10% × 70% | 0 | 0 | 7 | |

100 %

The working interest owned by Senior and "others" was a "carried" interest, i.e., free of expenses of drilling, production, maintenance, etc. However, the working interest, including that conveyed to Baxter, was still subject to Senior's agreement with

PSI, so that 85% of production revenues attributable to each interest went first to PSI.  Thus, for example, Senior received only 15% of 7% or 1.05% of any production from the well.  Significantly, Baxter, the owner of that portion of the working interest responsible for all costs associated with the well, received only 8.4% (15% of 56%) of the revenue produced by the well.

Sadly, some months later, production from the well diminished.  Senior advised PSI that a workover of the well was needed in order to restore production.  Senior did not have the funds to pay for the workover and Baxter was unwilling to do so in view of its slender cut of any revenue.  After negotiation, PSI agreed that it would loan Senior and Baxter the needed funds for this workover and some work to be done on another well subject to the Agreement.  In November 1988, the parties entered into a separate loan agreement and PSI deposited $250,000 in escrow to cover these workover costs.  The workover commenced and hopes for further production were renewed.  Indeed, by February 1989 production was restored, at least to some extent.

Things were not improving on all fronts, however.  In December 1988, Senior filed a Chapter 11 bankruptcy petition.  Furthermore, because of a dispute with Baxter, PSI refused to release from escrow the funds needed to pay for the workover.  There is some indication in the record that the total workover cost was over $335,000.  Timco Well Service (Timco), one of the contractors that

had performed services during the workover of the well, sought payment of its total charges of $96,868.19 from Senior (who had contracted for the services) and from Baxter.  Timco was not paid.

B

Timco then moved for an order from the bankruptcy court ordering payment of its charges as an "administrative expense."  On May 16, 1989, following a hearing, the bankruptcy court entered its order allowing Timco's charges as an administrative expense.  At that time, it also ordered PSI, who had not been a party to the hearing, to appear and show cause why it should not be required to pay a portion of those charges from revenue attributable to the well.

Thus, following a hearing on June 23, 1989, at which PSI appeared, the bankruptcy court entered the following order upon its minutes:  "Order to show cause dismissed.  Court holds that PSI cannot be surcharged under § 506(c) *at this time.*"  (Emphasis ours.)  On July 5, the court followed with its order vacating its June 23 order without prejudice to any of the parties.  PSI emphatically contends it never received a copy of this order, even though it is listed as having been sent one.  PSI, with even greater vigor, contends that the bankruptcy court's ruling following the June 23 hearing finally disposed of Timco's claim and that, under the principles of res judicata, its liability for Timco's claim is a dead issue.

On July 10, 1989, the trustee filed a motion with the bankruptcy court asking the court to reconsider its allowance of Timco's charges as an administrative expense. The bankruptcy judge denied this order on July 17, but gave the trustee an additional forty days to seek reconsideration of the court's allowance of Timco's claim. The trustee then filed a "Motion to Assess Section 506(c) Expenses and for Reconsideration of Allowance of Administrative Expense Claim." The trustee essentially argued that Timco's charges should not be allowed as an administrative expense. If they were so allowed, however, then PSI, rather than the estate, should pay its share because PSI would receive the lion's share of the revenue. The Trustee also argued that as a secured creditor PSI should properly be assessed its share under 11 U.S.C. § 506(c).[1] PSI countered that it was a royalty owner, not a secured creditor. PSI insisted that the Agreement clearly established that it received production payments, a form of royalty, and that the Agreement made clear that its arrangement with Senior was a "loan" only for tax purposes. This motion was heard at an "evidentiary rehearing" on October 20.

On July 30, 1990, the court rendered its memorandum opinion. 118 B.R. 444. In that opinion, the bankruptcy court held that PSI was a secured creditor under the terms of its Agreement with Senior, that the Agreement gave PSI only an in rem interest in the well and no right to proceed against Senior, that PSI had received

---

[1]Section 506(c) does not normally apply to prepetition expenses. This issue, however, was not presented on appeal and has been waived by the parties.

a benefit from the rework of the well, that the reworking charges of Timco Well Services were properly allowable as administrative expenses, that those charges were both "necessary" and "reasonable," and that 11 U.S.C. § 506(c) authorized charging PSI with its proportionate share of Timco's charges. On August 15, 1990, the court entered its judgment and ordered PSI to pay 59.5% of Timco's $96,868.19 bill, or a net amount of $56,636.57.

PSI appealed this judgment to the district court. On November 27, 1990, the district court affirmed the judgment of the bankruptcy court. This appeal followed.

## II

### A

Findings of fact made by a bankruptcy court will not be set aside unless clearly erroneous. In other words, this Court will reverse only "when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." [citation omitted]. Conclusions of law, conversely are subject to plenary review on appeal.

*In re Delta Towers, Ltd.,* 924 F.2d 74, 76 (5th Cir.), *reh'g denied* 1991 WL 8493, 1991 U.S.App. Lexis 4829 (5th Cir.1991). With this standard before us, we examine the issues raised by PSI in its appeal.

### B

PSI's status pursuant to the terms of the Agreement is the key issue in this appeal. All parties seem to agree that if PSI owns a royalty interest, it cannot be held responsible under any

theory for any portion of the costs of reworking the well. The bankruptcy court held that PSI was a secured creditor within the meaning of 11 U.S.C. § 506(c). The district court affirmed that holding. We review *de novo* as a question of law the issue of PSI's status under the Agreement.

PSI argues that the transaction between it and Senior was actually a mineral sale and its interest is a royalty. It says that a production payment is by definition a royalty interest—a share of actual product at the wellhead free of costs of extraction, but limited by amount, value or time and expiring when the limit is reached. The only difference, according to PSI, between a royalty interest and a production payment is that a royalty interest continues indefinitely while a production payment terminates when the predetermined limiting factor is met. Thus, PSI argues, the interest granted it by the Agreement is a share of production, free of costs of extraction, which share expires when the monetary limit set out in the agreement is reached; it is therefore a royalty.

PSI does admit that its interest is a "hybrid," as the Agreement gives PSI a lien on Senior's mineral interest under the well. Addressing this point, however, PSI contends that while its production interest in the well is a royalty, the lien created by the Agreement attached to Senior's *mineral interest,* thus allowing PSI to seize and operate the well if Senior failed to do so in breach of the Agreement. According to PSI's view, the fact that it

had a lien securing its "royalty" does not convert that "royalty" to repayment of a loan secured by the minerals producing the "royalty." In further support of its position that it is a royalty owner, not a creditor, PSI points out that it never filed a claim with the bankruptcy court against Senior; it was denominated a creditor only because the trustee listed it as such. It further argues that it has never voluntarily participated in the bankruptcy proceedings.

There are a number of reasons to reject PSI's argument that it is the owner of a royalty interest. We take as our launching point *Tidelands Royalty "B" Corp. v. Gulf Oil Corp.,* 804 F.2d 1344 (5th Cir.1986), cited at oral argument by both parties as supporting their respective positions. *Tidelands* instructs us to look exclusively to Louisiana law rather than hornbook law, or case law from other states, in interpreting mineral agreements in Louisiana. *Tidelands,* 804 F.2d at 1349, 1349 n. 15, n. 16. Under Louisiana law,

> [t]he royalty owner holds a nonexecutive interest—an interest that does not include the right to grant leases. *The distinguishing characteristic of a non-executive royalty interest is its "passive" nature.* The royalty owner has no right to explore, *develop,* or lease the subject tract. Moreover, the landowner *has no obligation to develop or lease the premises for the benefit of the royalty owner.* (Emphasis ours.)

*Tidelands,* 804 F.2d at 1350; *see also* LA.REV.STAT.ANN. 31:81 (West 1989) (The statute states: "The owner of a mineral royalty has no ... right to conduct operations ... to produce minerals." Comment characterizes the statute as verging on superfluous, but desirable

to "further elaborate the nature of the royalty and clearly state that it does not carry with it any operating rights."). Certainly, PSI's interest has none of these characteristics. Senior was obligated to produce the well and to make payments from that production. If it failed to do so, PSI could foreclose on the well, then operate it and make production. It, therefore, appears clear that PSI does not own a pure royalty interest in the well.

C

If not a royalty owner, what, then, is PSI's status? PSI's interest arises under the terms of an instrument called "Production Payment *Loan* Agreement." This instrument does not purport to be a mineral transfer; indeed, it is denominated by the parties as a *loan* agreement. However, "[i]n determining the nature of a transaction the court will look to its substance, not merely to the descriptive title." *Grace-Cajun Oil Co. v. FDIC,* 882 F.2d 1008, 1011 (5th Cir.), *reh'g denied* 1989 WL 98881, 1989 U.S.App. Lexis 16,118 (5th Cir.1989) (citing *American Bank & Trust Co. v. Louisiana Savings Ass'n,* 386 So.2d 96 (La.App.1980)).

We will therefore look to the substance of the Agreement, enlightened by Louisiana law. The Agreement provides that "[t]he Production Payment granted hereby *shall constitute a lien* upon the subject minerals covered hereby." Louisiana law in effect at the time of the agreement provided that "a mineral right is susceptible of mortgage to the same extent and with the same effect ... as ... immovables." LA.REV.STAT.ANN. 31:203 (West 1989) (current version

at West Supp.1991).  It also provided that "a mortgage of mineral rights may also provide for the pledge of minerals subsequently produced."  LA.REV.STAT.ANN. 31:204 (West 1989) (current version at West Supp.1991).  Under Louisiana law, the landowner has the right to explore and develop mineral resources under his land.  LA.REV.STAT.ANN. 31:15.  This right may be transferred by lease and the mineral lease is a "basic mineral right."  LA.REV.STAT.ANN. 31:16.  This interest of the mineral lessee is usually referred to as "the working interest."  LA.REV.STAT.ANN. 31:126, Comment.  Louisiana law defines a mortgage as "a right granted to the creditor over the property of the debtor for the security of his debt and [which] gives him the power of having the property seized and sold in default of payment."  LA.CIV.CODE ANN. 3278 (West 1972).  This description reflects exactly the power given to PSI by its "loan agreement" with Senior.  Further, the Agreement gave PSI the right to take production in kind if it so elected.  This right accords with the pledge provisions of Louisiana law noted above.  *See Grace-Cajun Oil Co. v. FDIC,* 882 F.2d 1008, 1011 (5th Cir.1989) (operation of Louisiana law in regard to pledge of hydrocarbon production).  It is, therefore, clear that Senior mortgaged—it did not transfer—its mineral interest in the well to PSI (and also pledged its production), and under Louisiana law, PSI must be classified as a secured creditor as opposed to a royalty owner.  The rulings of the courts below so holding are thus affirmed.

Additionally, once it is determined that PSI is not a royalty owner under Louisiana law, the next question to arise is, not

whether PSI is a secured creditor under Louisiana law, but whether PSI has an "allowed secured claim" under federal law. 11 U.S.C. § 506(c). We can arrive at this conclusion by a few inductive steps. First, PSI has a "claim" against the *property* of the estate. 11 U.S.C. § 101(5)(A) ("claim" defined as "right to payment"). As noted above, PSI has a right to payment from the minerals owned and produced by the debtor. Consequently, PSI has a claim against the debtor, Senior, within the meaning of the bankruptcy act. 11 U.S.C. §§ 101(10)(A), 102(2) (" "claim against the debtor' includes claim against property of the debtor"). It is clear from the Agreement that PSI's claim is secured by virtue of the lien the Agreement imposes on the minerals. 11 U.S.C. §§ 101(51), (37). Finally, the bankruptcy court recognized PSI's security interest and allowed monies to be paid to it pursuant to that security interest (although PSI was required to retain these monies for the trustee). We, therefore, hold that PSI has an "allowed secured claim."

D

(1)

We now come to the question whether PSI, by claiming an interest in the assets of a debtor in bankruptcy, was within the jurisdiction of the bankruptcy court. This question of law, if answered in the affirmative, is followed by a number of procedural questions. As to this initial question of law, we quickly conclude that once PSI asserted rights against Senior's interest in the well pursuant to the Agreement, it became part of the " "process of

allowance and disallowance of claims' [or] the restructuring of debtor-creditor relations."  At that point, both PSI and its secured interest were within the court's jurisdiction.  28 U.S.C. § 1334; *Granfinanciera v. Nordberg,* 492 U.S. 33, 58, 59 n. 14, 109 S.Ct. 2782, 2799, 2799 n. 14, 106 L.Ed.2d 26 (1989);  *see also In re Majestic Energy Corp.,* 835 F.2d 87, 91 (5th Cir.1988) (bankruptcy jurisdiction exists if the matter is "related to" bankruptcy, i.e., if the bankruptcy estate could conceivably be affected by outcome of matter).

(2)

We now turn to the arguments raised by PSI in opposition to the bankruptcy court's order that it pay a proportional share of the expenses for reworking the well.  PSI first argues that Timco had no standing to assert its claim as administrative expense under 11 U.S.C. § 506(c) because, in PSI's view, these claims could here be asserted only by the trustee.  In the first place, this argument is immaterial because, in fact, the 506(c) claim is being pressed by the trustee.  We note in passing, however, that we resolved this question in *In re Delta Towers,* 924 F.2d 74, 76–77 (5th Cir.1991). In that case, we concluded "that the advantages of § 506(c) are not limited to trustees" and held that a vendor of services to the debtor had standing to bring its claim under that section.  *Delta Towers,* 924 F.2d at 76.  Based on *Delta Towers,* Timco has standing to bring a 506(c) claim before the bankruptcy court.

(3)

PSI next argues that it was never served a summons and complaint requiring it to appear before the bankruptcy court and defend a demand. PSI further contends that "no motion for surcharge was ever properly brought before the Bankruptcy Court." Therefore, according to PSI, it was denied due process and the surcharge cannot stand. We disagree. We think that the bankruptcy court's order, directing PSI to show cause why it should not be surcharged for its share of Timco's expenses, fairly brought PSI before that court. PSI was afforded notice and an opportunity to be heard. Indeed, after that hearing, the bankruptcy court dismissed the show cause order and held that PSI would not be ordered to pay any of Timco's expenses "at [that] time." Furthermore, the motion filed by the trustee asking that the court reconsider its award to Timco of its charges as administrative expenses or, in the alternative, to surcharge PSI with its share of those expenses was properly entertained by the bankruptcy court. On that occasion, PSI was, again, given notice and an opportunity to be heard. *See In re Sam,* 894 F.2d 778, 781 (5th Cir.1990) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 657–58, 94 L.Ed. 865 (1950)) (due process requirement met by "notice reasonably calculated, under all the circumstances to apprise [creditor] of the pendency of the action and afford [creditor] an opportunity to present his objections."). In this case, PSI knew of the pendency of the action seeking surcharge of PSI for a portion of the workover expenses and it had an opportunity to present its objections. We find no denial of due process to PSI.

Finally, PSI argues that the bankruptcy court's minute entry of June 23, 1989, which confirmed its oral order dismissing Timco's claim against PSI is *res judicata* to that claim. We conclude that the proper reading of the minute entry is that the bankruptcy court simply held that it would not order PSI to pay any costs at that time; that holding, however, was without prejudice to Timco or the trustee to present the matter again to the court. This reading is supported by the court's July 5 order so stating. We thus find PSI's argument in this respect to be without merit. We now turn to what we consider to be the more difficult issues of this appeal.

E

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c). Usually, administrative expenses are satisfied out of the bankruptcy estate. Section 506(c), however, provides an exception. *Delta Towers,* 924 F.2d at 76 (citing *In re Trim-X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982)).

> Section 506(c) was intended by Congress as a codification of ... the equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the ... trustee which are required to preserve or dispose of the property subject to lien to the extent the lien-holder derives a benefit therefrom.

*3 Collier's on Bankruptcy,* ¶ 506.06. "The underlying rationale for

charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs." *In re Codesco, Inc.,* 6 C.B.C.2d 395, 18 B.R. 225 (S.D.N.Y.1982). In this case, the bankruptcy court correctly determined that "the general estate and unsecured creditors should not be required to bear the cost of protecting" PSI's 85% share of the production from the working interest.

Generally, the courts have allowed such expenses where there was a "clear and direct benefit" to the lienholder. *Id.* This court has held that in order to charge a secured creditor with expenses on the basis of § 506(c), three elements must be established: "1) the expenditure was necessary, 2) the amounts expended were reasonable, and 3) the creditor benefitted from the expenses." *Id.* (citing *In re Trim-X, Inc.,* 695 F.2d at 299.) Furthermore, the expenses must have been incurred 1) "primarily for the benefit of the secured creditor" and must have resulted in a 2) "quantifiable direct benefit" *to the secured creditor. See Delta Towers,* 924 F.2d at 77 (citing with approval cases so holding and discussing the lack of showing of a "quantifiable direct benefit" to secured creditor.). The burden of establishing these elements is on the claimant. *Id.* at 76 (citing *In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 77 (2d Cir.1984) ("*Flagstaff I*"); *Brookfield Production Credit Ass'n v. Borron,* 738 F.2d 951, 952 (8th Cir.1984)).

(1)

The bankruptcy court held that these expenditures were necessary for the preservation of PSI's collateral, the well and its production.  Before the workover, production had declined and after the workover, production was restored.  The bankruptcy court found that Senior, Baxter and PSI had agreed, before the work was done, that it was necessary.  We certainly cannot hold that the court was clearly erroneous in finding this workover to be necessary.

(2)

A recovery under § 506(c) also requires that the expenditure be "reasonable."  Apparently, all concerned, including PSI, agreed beforehand that the expenditure of at least $250,000 was reasonable under the circumstances.  Furthermore, the bankruptcy judge found that PSI had a representative present on site during the workover operations and that this representative took an active part in decisions made by Baxter and Senior concerning the methods to be pursued in completing the workover.  He also found that, by its conduct, PSI had impliedly or directly consented to expenditure of the funds necessary to rework the well.  We cannot say that the bankruptcy court was clearly erroneous in these findings, up to the expenditure of the $250,000 which PSI had agreed to fund.

The bankruptcy court also found that this expenditure was reasonable because PSI received approximately $97,000 in revenue for a pro-rata portion of expenses amounting to $56,636.57.  This

finding, however, seems to ignore that Timco's claim was only part of the cost of the workover. The total expenditure for the workover was apparently in excess of $335,000. If this is true, PSI's pro-rata share of the expenditures would have been approximately $200,000 (using the pro-rata share assessed by the bankruptcy court), not $56,000. The bankruptcy court thus erred to the extent that its finding of reasonableness was based on the workover charges of Timco and a comparison of only those charges to PSI's share of revenue from the well to determine that the expenditures were "reasonable."

Before the bankruptcy court can say that the expenditure of any amount in excess of $250,000 is reasonable, it will have to consider the totality of the circumstances, including any prior agreement between the parties as to the workover, cost overruns and responsibility for them, and projected revenue and actual earnings from the well as a result of the workover.

In the alternative, PSI, by its conduct, may have agreed in advance that expenditures in excess of $250,000 were reasonable. Although the bankruptcy court's opinion may be read to imply that PSI, by its conduct, did agree to these excess expenses, that court did not specifically so find.

In any event, for the reasons we have stated, we hold that the bankruptcy court erred in finding that the expenses over $250,000 were "reasonable". We affirm, however, the courts below

in holding that expenditures up to $250,000 were "reasonable."  If the bankruptcy court should find that PSI, implicitly or explicitly, consented to expenditures above $250,000, then such expenditures would be "reasonable," by virtue of that consent, for purposes of assessing 506(c) charges against PSI.  *Cf.* 3 COLLIER ON BANKRUPTCY ¶ 506.06 (consent by secured creditor may be treated as advance acknowledgement that such expenses will confer a benefit on creditor.)

(3)

In order to support a surcharge under Section 506(c), not only must the expenditures be "necessary" and "reasonable" but the expenditures must have resulted in a quantifiable direct benefit to the creditor and must have been made primarily for the creditor's benefit.  *Delta Towers,* 924 F.2d at 77.  PSI makes the dubious and unsupported argument that it cannot be charged expenses under Section 506(c) unless it receives a benefit not received by anyone else as a result of that expenditure, i.e., "higher than the proportionate benefit received by ... any other interest in the well."  To the extent that its argument might rest upon our holding that the expense must be *primarily for the benefit of the creditor, Delta Towers,* 924 F.2d at 77, PSI misreads the test to determine chargeability under 506(c).  "Primarily for the creditor's benefit" as a determinative factor in a section 506(c) analysis is particularly case specific.  In this case, for example, the very fact that PSI received 59.5% of the production rendered the workover expense "primarily" for its benefit.  This conclusion is

not to say, however, that in an appropriate case, a 506(c) charge cannot be made against a minority secured interest holder. We would further point out that *Delta Towers* states that "expenses which benefit the debtor *or other creditors* rather than the secured creditor himself *are immaterial,* [citation omitted]." (Emphasis ours). *Delta Towers,* 924 F.2d at 77. This observation suggests that neither proportionality nor non-proportionality is a factor in the "benefit" analysis; the focus is on the benefit to the secured creditor. Consequently, we find PSI's argument without merit. The courts below correctly found that the workover was "primarily" for PSI's benefit.

More relevant under the facts of this case, however, is that when "the holder of the secured claim has consented to ... preservation by the debtor ..., the court may treat such consent as an advance acknowledgement that certain of the costs and expenses incurred would benefit such holder.... Consent may also be found to have been impliedly given." 3 COLLIER ON BANKRUPTCY ¶ 506.06. PSI, by its conduct to which we have earlier alluded, acknowledged in advance that the expenditure of up to $250,000 to rework the well would be to its benefit.

Finally, with respect to the requirement that the benefit be direct and quantifiable, the telling fact is that PSI, before the workover, was receiving no revenue as a result of production from the Champagne sand; after the workover, it was receiving revenue from restored production. The revenue it received, and will

receive in the future, is, absent the operation of section 506(c), free and clear and is unquestionably a "direct and quantifiable benefit" to PSI.

(4)

We must now determine whether the bankruptcy and district courts erred in assessing PSI a 59.5% share of expenses. The bankruptcy court correctly stated that "[o]wing to the Production Payment Loan Agreement, PSI essentially had an 85% interest in the 70% interest in the well." The court then stated that "PSI received 59.5% of the[ ] revenues after royalty burdens and so should be taxed or surcharged for only 59.5% of the workover costs" and on this basis assessed PSI 59.5% of Timco's charges. The district court affirmed "the Bankruptcy Court's assessment against PSI." The court erred in so holding because it failed to take into account that Section 506(c) allows recovery only "from property *securing an allowed secured claim*.... [emphasis ours]." 11 U.S.C. § 506(c). In order to correctly apply this section, we must first determine what "property secur[es]" that claim and then determine the quantum of the "allowed secured claim."

> First, it must be determined whether the estate actually has an interest in the collateral. If, for example, the collateral was transferred by the debtor prior to the commencement of its bankruptcy case, the debtor retained no interest therein, and the transfer has not been set aside, the estate has no interest therein and secured claim status cannot be based on a lien against the transferred collateral.

3 COLLIER ON BANKRUPTCY ¶ 506.04. Furthermore, we have stated, in a case construing the predecessor to section 506(a), that a

creditor is not a "secured creditor" where "the security interest is in property not belonging to the bankrupt, even if the security interest originally encumbered property of the bankrupt that the bankrupt parted with prior to bankruptcy." *R.I.D.C. Indus. Dev. Fund v. Snyder,* 539 F.2d 487, 491 (5th Cir.1976). We held that "R.I.D.C. ... held a security interest in property in possession of the bankrupt, but prior to bankruptcy the property was conveyed to a third person. Thus ... R.I.D.C. was not a secured creditor." *Id.* at 492. In the present case, Senior transferred its working interest to Baxter prior to bankruptcy, that transfer has not been set aside, and Senior retains only a 7% carried interest. Therefore, PSI is a "secured creditor" of the bankruptcy estate only as to Senior's 7% interest in the well; or, stated in the context of our analysis here, the "property securing the allowed secured claim" is only Senior's 7% interest in the well.

We next turn to 11 U.S.C. § 506(a) to identify the "allowed secured claim." This section provides that "an allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a *secured claim to the extent* of the value of such creditor's interest *in the estate's interest in such property*.... [emphasis ours]." *Id.* We transpose that language to the facts at hand: the "allowed claim of a creditor [PSI] secured by a lien [the right to production given by the Agreement] on property in which the estate has an interest [the well] ... is a secured claim to the extent of the value of such creditor's [PSI's] interest [85%] in the estate's interest [Senior's 7% interest] in such

property [the well]." Therefore, PSI has a secured claim to the extent of 85% of Senior's 7% interest in the well, or 5.95%. As we have already held, this is an "allowed secured claim." The "property securing [that] allowed secured claim" is *Senior's interest* in the well, *not* the entire 70% working interest, and, accordingly, the trustee may recover administrative expenses allowed under section 506(c) in an amount not exceeding 5.95% of the well's total production.

The courts below, therefore, were in error in assessing PSI's share of administrative expenses as 59.5% without considering the fact that the entirety of that share must come from revenues attributable to 5.95% of the well's production because that is the "property securing an allowed secured claim." Section 506(c) also limits surcharges to "the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). In the peculiar circumstances of this case, the "extent of the benefit" to PSI is 59.5% of the revenues attributable to restored production and is always more than the amount recoverable from "property securing an allowed secured claim"—PSI's 85% interest in Senior's 7% interest, or 5.95%. On remand, PSI's proper share of the workover expenses should be determined only after consideration of the benefit "cap" as well as PSI's 5.95% share of production as the sole source of payment for § 506(c) surcharges against PSI.

F

We sum up and conclude as follows: The courts below did not

err in finding the expenditures in question "necessary" and that they were made "primarily for the benefit" of PSI. Nor did they err in finding that the expenditures conferred a benefit on PSI to the extent of the revenues it received as a result of the restored production of the well. PSI can be surcharged for workover expenditures no amount greater than 5.95% of the total revenues resulting from restored production. Under section 506(c), this is its share of "property securing an allowed claim." 11 U.S.C. 506(c). This holding, however, does not preclude the bankruptcy court from equitably charging PSI more than 5.95% of the total workover costs so long as such charges do not exceed 5.95% of the revenues from the restored production.[2]

Remand is, therefore, necessary to determine what percentage of the workover expenses will be assessed against PSI. Remand is further necessary for a determination by the court below whether the expenditures in excess of $250,000 were "reasonable." Only to the extent that these expenses are found reasonable, whether by PSI's consent or otherwise, may the court below order surcharge of PSI under the provisions of section 506(c) for a share of those expenditures in excess of $250,000.

---

[2]We also note that, absent the operation of § 506(c), PSI, as a carried interest, would have *no* obligation to pay any of the rework expenses. PSI's only commitment (as the case was presented to us) was to lend money to Senior and Baxter in order to fund the workover. We do not address what rights, *if any,* in or out of bankruptcy court, PSI has to recover the charges, or any part thereof, assessed against it under § 506(c) from other parties, including an unsecured claim against the estate which we understand is still in the process of being administered.

We, therefore, REVERSE the holding below that surcharges PSI with 59.5% of Timco's charges based on section 506(c) and REMAND for further proceedings not inconsistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.