**In re SENIOR G & A OPERATING COMPANY, INC., Debtor.**

**Bankruptcy No. 88–50316–LO–7.**

United States Bankruptcy Court, W.D. Louisiana, Lafayette–Opelousas Division.

July 30, 1990.

Douglas F. Pedigo, Lafayette, La., for PSI of Missouri, Inc.

Gerald DeLaunay, Lafayette, La., for TIMCO Well Service.

Kent Aguillard, Eunice, La., Trustee.

Stephen Strohschein, Baton Rouge, La., for trustee.

Robert Brenham, John Grant, Lafayette, La., for Baxter Drilling.

## MEMORANDUM OPINION

W. DONALD BOE, Jr., Bankruptcy Judge.

### Overview

This court on May 16, 1989 ruled that the post-petition portion of the workover performed by TIMCO Well Service (TIMCO) on the U. Richard 2, 2–D Well (the Richard Well) in the Erath Field was an actual, necessary expense of preserving the Debtor's estate which entitled TIMCO to a class one administrative expense priority under 11 U.S.C. Sec. 507(a)(1) in the amount of $96,868.19. Subsequently, the Chapter 11 Trustee sought to surcharge or assess the expenses of the well workover against PSI of Missouri, Inc. (PSI) and also to obtain reconsideration of the court's May 16, 1989

ruling. The court denied the request to reconsider that ruling.[1]

At a June 23, 1989 hearing on the surcharge issue, the court in oral findings rejected PSI contentions that the effort to surcharge it was not "core". A surcharge under 11 U.S.C. Sec. 506(c) has no existence outside bankruptcy and is clearly a core proceeding under 28 U.S.C. Sec. 157(b)(2) which the bankruptcy judge has the power to both hear and determine. At that same hearing, the court determined that PSI had benefited from the well workover but was unable to quantify the extent of that benefit. (Transcript at 127.) The Chapter 11 Trustee subsequently requested reconsideration and the court set this matter down for an evidentiary rehearing. The court disagrees with PSI's contention that the court's decision of June 23, 1989 is *res judicata*.

The court's minute entry for the hearing, which found that PSI could not be surcharged "at this time", was neither signed by the judge, nor stated to be an order or judgment of the court. When this judge uses a minute entry to function also as an order, the minute entry is expressly so labeled and signed by the judge. Furthermore, the section of the minute entry form stating "Judgment to be prepared by" was left blank. The minute entry lacked finality and simply denied the relief sought "at this time". The minute entry, which itself was not an order, was never followed by any order signed by the court. There was no final order of any type that would have allowed parties as a matter of right to appeal the court's interim findings. Accordingly, PSI's motion to dismiss the evidentiary rehearing was denied.

The Section 506(c) issue was taken under advisement following the evidentiary rehearing held on October 20, 1989. The court now rejects PSI's arguments that its alleged non-cost bearing interest in well production cannot (because of Louisiana law) be surcharged under Sec. 506(c) of the Bankruptcy Code. The court concludes that PSI should be surcharged in accordance with its undisputed 59.5% net revenue interest in the well for 59.5% of the post-petition work performed by TIMCO. PSI actively sought performance of the workover, engaged in some superintendence of that work, and received benefits from it at least commensurate with the amount of the surcharge. The surcharge is needed to avoid unjust enrichment of PSI at the expense of other creditors of the estate.

### Facts

The Debtor, Senior G & A Operating Company, Inc. (Senior) had working interests in various wells including a 70% working interest in the Richard Well. However, on July 21, 1988, PSI and Senior entered into a Production Payment Loan Agreement (the Agreement), pursuant to which PSI lent $5,100,000 to Senior. In return, Senior conveyed to PSI a production payment on various wells including the Richard Well.[2] Senior was obliged to pay PSI a percentage of gross revenues that Senior received until PSI received $12,750,000. Production payment is defined in the Agreement:

*"Production Payment"* shall mean a sum of twelve million seven hundred fifty thousand dollars ($12,750,000.00), payable by Senior out of the Production Payment Percentage of (i) the Subject Minerals or (ii) Gross Revenue attributed to the Subject Minerals, produced each Month from the Existing Wells. If said Subject Minerals or any part thereof are produced but not sold, then said Production Payment with respect to such Subject Minerals produced but not sold, shall mean such percentage based upon the fair market value of such Subject Minerals at the point of production. PSI reserves the right, at its election, to take in kind such volume of Subject Minerals as is equivalent to the percentage of Gross

---

1. This bankruptcy case is now in Chapter 7 and has a Chapter 7 trustee.

2. The Richard Well (U. Richard 2 and 2–D) is referred to in the Production Payment Loan Agreement as C. Richard # 3. (Exhibit No. 3 to Deposition of Richard L. Cornelius.) The Richard Well has produced from two different sands, the Champagne (or lower) sand and the Broussard sand.

Revenues as provided in Article IV hereof. The Production Payment granted hereby shall constitute a lien upon the Subject Minerals covered hereby.

Gross Revenue is a term of art in the Agreement and defined as the monies realized by Senior before deduction of production taxes, operating expenses, and the cost of gathering and transporting gas to a metering station, but after deduction of lease burdens and overriding royalties which burdens were acknowledged to be 30%. The Agreement provided that the production payment created a lien on any right, title, or interest of Senior in and to any personal property, structures, equipment then or thereafter placed on or used in connection with the Richard Well. The production payment involved only an *in rem* obligation. PSI had no recourse under the Agreement against Senior or other working interest owners. The Agreement required that Senior comply with its obligations as lessee to pay all processing fees, operation payments and royalty burdens.

Several months after the Agreement had been signed by PSI and Senior, Senior advised PSI that a workover of the Richard Well was necessary and that Senior did not have sufficient funds to cover the costs. Senior also advised that it lacked funds to complete another well, the U. Richard No. 1 Well.[3] Baxter Drilling & Exploration (Baxter), another working interest owner, initially refused to authorize expenditures for workover of the Richard Well. But after negotiations, Senior, Baxter, and PSI signed a Letter Agreement on November 18, 1988. PSI agreed to lend Baxter $250,-000 to cover costs of operations for the U. Richard No. 2, 2–D and the U. Richard No. 1 wells. In return, PSI was to receive a production payment from still another well, A. Carter No. 1.[4]

Pursuant to the Letter Agreement, $250,-000 in loan funds were placed into escrow to assure payment of all contractors and subcontractors of Senior and/or Baxter on the U. Richard 2, 2–D and U. Richard No. 1 wells. Funds were to be released under the Letter Agreement by the escrow agent only upon presentation to it of invoices accompanied by instructions from PSI authorizing and directing payment. A separate agreement between PSI and Commerce Bank of Kansas City, the escrow agent, was then executed.

Rework activities on the Richard Well commenced in December 1988. Shortly thereafter, Senior filed a Chapter 11 bankruptcy petition. Workover operations continued nonetheless until late January or early February. The workover undisputedly restored flow to the Champagne Sand of Richard Well No. 2. PSI had an engineer on site and was highly influential in decisions to use 24 hour rig (rather than a daylight rig) and a larger pump.

About January 13, 1989, Senior informed PSI that the workover operations had exceeded the $250,000 escrow. PSI requested directions from Baxter and Senior as to how to disburse the $250,000. At this point, Baxter apparently decided it wanted out. Baxter rejected PSI's proposal to direct disbursements to creditors, would not authorize payments for work done on the Richard Well and others which Senior operated, and refused to pay more money to retire lien creditors. PSI thus declined to pay contractors like TIMCO.

As earlier stated, the cost of TIMCO's workover was found to constitute an administrative expense of the estate in the amount of $96,868.19. This matter is *res judicata.* The court's ruling was in a minute entry signed by the judge which expressly stated it was an order of the court. That issue will not be reconsidered. The matter now before the court is whether the Trustee can assess some or all of the well workover expense against PSI under Sec. 506(c).

*Law and Arguments*

Section 506(c) states:

---

3. The possibility of cost overruns on these wells had been previously recognized in Article III, paragraph E, of the Production Payment Loan Agreement.

4. The Letter Agreement also obligated Senior and Baxter to enter into agreements to liquidate all creditors' claims against that well.

"(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

Any recovery by the Trustee of expenses for preserving or disposing of collateral is limited to the extent of the benefit to the holder of the secured claim. H.R.Rep. 95–595, 95th Cong., 1st Sess. 357 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

■ Sec. 506(c) was enacted by the Bankruptcy Reform Act of 1978. It codifies a case law exception to the general rule that administrative expenses are not charged against secured creditors. This exception applies when expenses have been incurred primarily for the benefit of secured creditors or where they have caused or consented to such expenses. Consent and causation continue to be relevant considerations following the Bankruptcy Reform Act even though the emphasis of Sec. 506(c) is on benefit. *Matter of Trim–X, Inc.*, 695 F.2d 296, 301, 9 B.C.D. 1358, 7 C.B.C.2d 955 (7th Cir.1982). A Sec. 506(c) award of expenses has been denied where the secured creditors that were sought to be surcharged received no financial benefit and did not consent to participate in paying expenses. *Gravel, Shea, & Wright v. Bank of New England (In re New England Carpet Co.)*, 744 F.2d 16, 12 B.C.D. 849 (2nd Cir.1984).

■ The Second Circuit appears to have adopted a test requiring that the expenses be incurred "primarily" for the benefit of secured creditors and that the secured creditors "directly" benefit unless they consent to the expenses. Consent is not to be lightly inferred. The Second Circuit decisions express particular concern that inferring consent from creditor cooperation with a Chapter 11 debtor-in-possession could discourage creditors from providing post-petition financing to aid or support reorganization efforts. *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Food Services Corp.)*, 739 F.2d 73,

75–77 (2nd Cir.1984); *General Electric Credit Corp. v. Peltz (In re Flagstaff Food Services Corp.)*, 762 F.2d 10, 11–13, 13 B.C.D. 745, 12 C.B.C.2d 1019 (2nd Cir.1985). There is no cause for such special concern in the present case since the well workover began with PSI's encouragement before Senior filed its Chapter 11 petition.

■ A Sec. 506(c) surcharge enables the Trustee to recover what the statute describes as "reasonable, necessary costs and expenses" to the extent the holder of a secured claim has benefited from them. Whether expenses are reasonable, necessary and have benefited the secured party rests with the sound discretion of the trial judge and involves a question of fact which is reversible only if clearly erroneous. *Bank of Honolulu v. Anderson (In re Anderson)*, 66 B.R. 97, 99 (9th Cir. B.A.P. 1986), citing *Matter of Trim–X, Inc.*, 695 F.2d 296, 299, n. 4 (7th Cir.1982), and Bankruptcy Rule 8013.

■ The trustee has the burden of showing that absent the costs expended by the estate, the property would yield less to the creditor. *Brookfield Production Credit Ass'n. v. Barron*, 738 F.2d 951, 952 (8th Cir.1984). This is not to say that only a trustee can bring a motion to charge collateral under Sec. 506(c). The courts have allowed other parties, including post-petition creditors, to act in the trustee's stead. *See In re McKeeport Steel Castings Co.*, 799 F.2d 91 at 93–94; *In re Anderson, supra;* 2 L. King. *Collier on Bankruptcy* Par. 506.06 at 506–57 and 506.58, n. 7a (15th ed. 1989). Thus, PSI can have no valid objection to the fact that TIMCO has participated in the litigation of this matter.

A surcharge under Sec. 506(c) is recovered "from property securing an allowed secured claim". In other words, one who is benefited by costs and expenses incurred must have a "security interest" in property. "Security interest" is defined by Bankruptcy Code Sec. 101(45) as a "lien created by an agreement". "Lien" is defined by Bankruptcy Code Sec. 101(33) as "charge against or interest in property to secure payment of a debt or performance of an obligation".

The Trustee argues that TIMCO's workover resulted in a direct quantifiable benefit to PSI, that PSI consented to the work performed, and that costs of the workover can therefore be charged to PSI. The Trustee argues that if the estate were to be responsible for workover costs, PSI would be unjustly enriched, a result which Sec. 506(c) was designed to prevent.

PSI contends that it cannot be surcharged under Section 506(c) because its production payment is, under state law, a "noncost bearing interest". PSI correctly notes that a production payment under Louisiana law is an actual share of the minerals produced from a tract of land, free and clear of the costs of production at the surface which terminates once a specified sum from the sale of minerals is realized. *See* La.R.S. 31:16 Comment; *Texas Gas Exploration Corp. v. Brian Investments*, 544 So.2d 67 (La.App. 1st Cir.1989). From this, PSI concludes that any attempt by the Trustee to surcharge cash revenues attributable to production takes property of PSI by taxing operating expenses for which it is not liable as recipient of a production payment. In PSI's view, a surcharge under Sec. 506(c) is inconsistent with the very nature of the security interest for which it bargained. Additionally, PSI argues that it is neither contractually bound to pay for TIMCO's work or to release the $250,000 in escrow once Baxter had defaulted on its obligations under the Letter Agreement.

### Conclusions

■ The court is not persuaded by PSI's arguments which compare state apples with federal oranges. If a secured creditor like PSI were liable based on contract or other state law for an expense of the estate, then a trustee would not need to use Sec. 506(c). A Sec. 506(c) surcharge arises from federal law to prevent unjust enrichment, not from contract or state law.

The court agrees with PSI that a production payment is an *in rem* right involving an actual share of the minerals produced. A production payment resembles a royalty. See L. McDougal III, *Louisiana Oil and Gas Law* Sec. 3.2, fn. 45, and Sec. 5.1, p. 249. A mineral royalty under Louisiana law is the right to participate in production of minerals from land owned by another or land subject to a mineral servitude of another. Unless expressly qualified otherwise by the parties, a royalty is a right to share in gross production free and clear of mining and drilling or production costs. La.R.S. 31:80.

There is, however, in this case some question whether the production payment carved out of Senior's portion of the working interest in the well really constitutes a royalty in the strict sense since the production payment did not comprise a part of a negotiated instrument resulting in the execution of a lease. *See* La.R.S. 31:213(5); *Louisiana Oil and Gas Law*, Sec. 5.1, p. 249. Moreover, the Production Payment Loan Agreement does not in any explicit terms say that this interest is "free and clear". This court will simply assume for the purposes of this opinion that PSI's production payments are free of drilling and production costs under state law. Whether PSI is or is not responsible under contract or other Louisiana law for costs of the workover is irrelevant to the Sec. 506(c) issue. The Production Payment Loan Agreement gives PSI a security interest, "a lien created by agreement", as defined by Sec. 101(45). Under the express terms of the Agreement, the production payment constitutes a lien. Accordingly, PSI has security in property as contemplated in Sec. 506(c).

The well rework is a reasonable and necessary expense of preserving this property. The Richard Well was not producing at all from the Champagne Sand prior to the workover. But after the well workover there were substantial sales of hydrocarbons accessed from this sand by the Richard No. 2 Well. The Trustee's professional who was appointed to perform day-to-day oil and gas accounting operations provided evidence that between January 1989 and May 1989 PSI received $77,124.86 in cash on its equivalent from the U. Richard No. 2 Well. (Guardia Affidavit—Trustee Exhibit 1). By the end of July 1989 the revenues received by PSI had grown to approximate-

ly $97,000. (Guardia Testimony, October 20, 1989 Transcript, pp. 104, 116.) This well was producing nothing before the workover. Because PSI would not have received these funds or any thereafter without the well workover, the court finds the workover expenses directly benefitted PSI.

Additionally, the court finds that the expenses were incurred primarily for the benefit of PSI. PSI had lent $5,100,000 to Senior secured in part by production from a well that had stopped producing. Owing to the Production Payment Loan Agreement, PSI essentially had an 85% interest in the 70% interest in the well. Obviously, PSI had a keen interest in restoring production to U. Richard No. 2.

The evidence shows that Baxter was willing to walk away from this well and that Senior could not fund the workover. While the Letter Agreement by which PSI agreed to lend the costs of the workover to Baxter may not create liability on the part of PSI, it does show that PSI approved and promoted a workover.

The workover continued after Senior filed bankruptcy. PSI actively participated in the workover keeping an engineer on site and making decisions or at least suggestions affecting operations, *e.g.* use of the larger pump, and the 24 hour rig (rather than a daylight rig) which increased the total cost of the workover.

PSI was benefited by the workover because the workover restored production to the U. Richard No. 2. Without the workover, this well would not have produced revenues. PSI received 59.5% of these revenues after royalty burdens and so should be taxed or surcharged for only 59.5% of the workover costs. The Trustee's recovery of expenses must be limited to the extent of the benefit to secured claimant, PSI. While PSI has received sufficient proceeds from production to cover the entire $96,868.19 expense, it would not be equitable to hold PSI responsible for this entire amount. Bankruptcy Courts

have discretion to determine when and how much recovery shall be allowed from a secured party. *In re Bob Grissett Golf Shops*, 50 B.R. 598, 603 (Bankr.E.D.Va. 1985). The Chapter 11 Trustee and TIMCO have shown by a preponderance of the evidence that the expenses of the workover were reasonable, necessary and beneficial to PSI. *See, In re P.C. Limited*, 110 B.R. 232 (E.D.La.1989). The estate is therefore entitled to obtain from PSI 59.5% of the $96,868.19, which amounts to $56,636.57.[5]

The court will sign a Final Order consistent with this Memorandum Opinion and suggests that the Chapter 11 Trustee and the Chapter 7 Trustee consult on its preparation.

---

5. Both the Trustee and PSI alluded in briefs and arguments to Baxter's responsibility for these costs. This holding does not prevent either party from pursuing whatever rights it may have against Baxter.